UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                      :
MARIO HERNANDEZ, CANDIDO MARCO, ELISEO      :
PUENTE ROMERO, JOSE LUIS RODRIGUEZ,           :         14 Civ. 4176 (PAE)
LEONIDES ROSALES, and RENE TORRES            :
GONZALEZ,                                    :         OPINION & ORDER
                                                      :
                                    Plaintiffs,       :
                                                      :
                    -v-                               :
                                                      :
JRPAC INC. (d/b/a SPICE SYMPHONY), JUDE       :
RODRIGUES, CHAD LEO, and PREMENDRA           :
CHAOUHAN,                                     :
                                                      :
                                    Defendants.       :
                                                      :
------------------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED:  6/9/16

PAUL A. ENGELMAYER, District Judge:

This decision sets out the Court's findings of fact and conclusions of law pursuant to

Federal Rule of Civil Procedure 52, following a three-day non-jury trial in this case, brought

under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), the New York Labor

Law ("NYLL"), §§ 190 *et seq.* & §§ 650 *et seq.*, and regulations promulgated under the NYLL

by the New York State Department of Labor ("NYSDOL"), *see* 12 N.Y.C.R.R. § 146.[1]

Plaintiffs are six former employees of JRPAC Inc. ("JRPAC") d/b/a Spice Symphony

("Spice Symphony" or the "restaurant"), an Indian-food restaurant in New York City.  Four

worked as delivery workers, one worked as a food preparer and delivery dispatcher, and one

---

[1] The case caption above reflects the names of the plaintiffs listed in the Complaint and who
have filed their consent to participate in this collective FLSA action. *See* Dkts. 1, 78–83.
Omitted as plaintiff is Luis Fernando DeAquino, a plaintiff originally named in the Complaint,
*see* Dkt. 1, but who did not participate in the trial and did not file a consent to participate in the
collective FLSA action.  The caption also omits defendant "Peter Doe," who was named in the
original Complaint. *See id.*  A separate order will follow as to these parties.

worked as a cook.  Plaintiffs allege that the restaurant and its managers, defendants Jude
Rodrigues, Chad Leo, and Premendra Chaouhan, violated the FLSA and/or the NYLL by failing
to pay them statutorily required minimum and overtime wages and spread-of-hours pay, failing
to provide them with required wage notices and statements, and requiring the delivery workers to
provide their own tools of the trade, specifically, bicycles and related equipment that they used to
make deliveries.  Plaintiffs seek back pay, liquidated damages for the minimum wage, overtime,
and spread-of-hours claims (as well as prejudgment interest on the spread-of-hours claims),
statutory penalties for the wage notice and statement violations, and damages for the cost of
providing their own tools of the trade.

The parties tried the case before the Court on September 21 and 22, and October 13,
2015.[2]  Each witness's direct testimony was received in the form of a sworn declaration;[3] cross-
examination was live.  Plaintiffs, none of whom speaks English as his primary language, each
testified with the assistance of a translator.  Defendants called eight witnesses, including the
three defendants and five current or former Spice Symphony employees.  These witnesses
testified without the assistance of a translator.  Post-trial memoranda, including proposed
damages calculations, were fully submitted on October 30, 2015.  Dkts. 76 ("Def. Br."), 77 ("Pl.
Br.").

For the reasons set forth below, the Court finds that Spice Symphony, Rodrigues, Leo,
and Chaouhan violated the minimum wage, overtime, tools of the trade, spread-of-hours, and
wage notice and statement provisions of the FLSA and NYLL.  On the basis of these violations,

---

[2] "Tr." refers to the transcript of the trial.

[3] Several of the declarations were misnumbered such that there were pairs of paragraphs bearing
the same number.  The Court will simply cite to the paragraph number listed in the declarations,
as the context makes clear to which paragraph the Court is referring.

the Court awards plaintiffs back wages, costs for tools of the trade, liquidated damages, prejudgment interest on the spread-of-hours claims only, and statutory penalties.

## FINDINGS OF FACT

### I.     The Parties

#### A.     Defendants

JRPAC, d/b/a Spice Symphony, is a corporation organized and existing under New York State law, which maintains its principal place of business at 182 Lexington Ave., New York, NY 10006. Dkt. 47 ("Joint Stip. of Fact"), ¶ 4. Spice Symphony operates an Indian restaurant, known by the same name and located at 182 Lexington Ave, New York, NY 10006. Joint Stip. of Fact ¶ 3; Tr. 383 (Chaouhan). The restaurant opened in September 2012. Tr. 372 (Chaouhan); Romero Decl. ¶ 7. It is about 800 square feet in size, with 16 tables in the dining room; its kitchen is approximately 200 square feet. Rodrigues Aff. ¶ 2, Leo Decl. ¶ 2, Chaouhan Aff. ¶ 2.

Spice Symphony had annual sales exceeding $500,000 in the years 2013 and 2014, and the employees of Spice Symphony regularly used ingredients and other items that traveled or were produced in interstate commerce. Joint Stip. of Facts ¶¶ 5–6.

At all relevant times, Spice Symphony was open between 11 a.m. and 11 p.m. Sundays through Thursdays, and between 11 a.m. and 11:30 p.m. on Fridays and Saturdays. Rodrigues Aff. ¶ 2; Leo Decl. ¶ 2; Chaouhan Aff. ¶ 2.

Chaouhan is a manager of JRPAC. Chaouhan Aff. ¶ 1. He hired Romero. Tr. 372 (Chaouhan). The other plaintiffs were hired by Leo, although Chaouhan finalized their pay arrangements and had final say over their pay. Tr. 356–57 (Leo). Chaouhan initially worked full time at the restaurant and maintained its records, but beginning in February 2013, he began to attend the restaurant only in the evenings and turned over responsibility for its records to Leo.

Tr. 373 (Chaouhan).  Chaouhan was one of the managers who paid the delivery workers their tips at the end of the day.  Tr. 241–42 (Rodrigues).

Leo was a manager of JRPAC during the relevant period.  Leo Decl. ¶ 1.  He hired all plaintiffs except for Romero, and had initial conversations with plaintiffs regarding their pay. Tr. 356–57 (Leo).  In February 2013, Leo took over responsibility for maintaining the records of Spice Symphony from Chaouhan; at some later point, this responsibility was taken over by Rodrigues.  Tr. 373 (Chaouhan).  Leo was generally present in the restaurant during all hours it was open six days per week, and was responsible for monitoring employees' work hours and schedules, and assigning them their job responsibilities.  Tr. 259 (Chaouhan), 344–48 (Leo).  Leo was the other manager who paid the delivery workers their tips at the end of the day.  Tr. 241–42 (Rodrigues).

Rodrigues is JRPAC's President.  Rodrigues Aff. ¶ 1.  He was responsible for maintaining Spice Symphony's books and records, and for paying plaintiffs, after he took over that responsibility from Leo.  Tr. 373 (Chaouhan).  Rodrigues maintained the books and records, and paid plaintiffs, according to hours-worked information that Leo and Chaouhan gave him.  Tr. 330 (Rodrigues).  Rodrigues was generally present in the restaurant only on Tuesdays.  *See* Tr. 261 (Rodrigues).

### B.      Plaintiffs

Hernandez, Marco, Romero, Rodriguez, Rosales, and Gonzalez were employees of JRPAC.  Joint Stip. of Fact ¶ 2.

On June 10, 2014, plaintiffs filed this lawsuit.  Joint Stip. of Fact ¶ 1; Dkt. 2.  On November 11, 2015, each filed a consent to join the lawsuit as a party plaintiff.  Dkts. 78–83.

Four plaintiffs, Hernandez, Marco, Rodriguez, and Gonzalez, worked as food delivery workers at Spice Symphony.  Hernandez Decl. ¶ 7; Marco Decl. ¶ 9; Rodriguez Decl. ¶ 10;

4

Gonzalez Decl. ¶ 7. The Court finds that, as each of the four testified, in addition to their delivery work, each also regularly engaged in other tasks. Some were related to their delivery duties, such as preparing sauces in small containers to be placed in delivery packages; others were not, including taking out the garbage, breaking down cardboard boxes, stocking food in the basement and bringing food from the basement to the kitchen, sweeping and mopping the restaurant, and cleaning the kitchen. *See* Hernandez Decl. ¶ 8; Marco Decl. ¶ 10; Rodriguez Decl. ¶ 11; Gonzalez Decl. ¶ 8; Leo Decl. ¶ 13 (acknowledging that delivery workers spent up to one hour each day bringing things from the basement to the kitchen, cleaning up the basement, and mopping the kitchen and taking out the garbage); Chaouhan Aff. ¶ 14 (same); Rodrigues Aff. ¶ 14 (same). The Court finds that while the delivery workers, during the course of their employment, spent some time preparing food, such as by cutting vegetables or peeling shrimp and onions, such activities were limited and sporadic. The Court bases this finding on the credible testimony of defendants that the preparation of food, including chopping, requires a particularized set of skills so that the food cooks evenly and properly, and that therefore it was the cooks, not the delivery workers, who generally did such work. Tr. 358 (Leo).[4]

The Court finds that plaintiff Romero worked as a food preparer and also oversaw the work of the delivery workers, including by acting as a dispatcher for these workers, at Spice Symphony. Romero Decl. ¶ 8; Tr. 108. While defendants initially declared that he was a dishwasher, Rodrigues Aff. ¶ 2; Leo Decl. ¶ 2; Chaouhan Aff. ¶ 2, Romero credibly denied that characterization (while acknowledging that he sometimes washed dishes), Tr. 107–08, and

---

[4] For the reasons that follow, the Court does not, and need not, make findings with regard to the modest amount of time plaintiffs spent on non-delivery activities each day. *See infra* note 24.

defendants ultimately acknowledged, based on plaintiffs' uniform testimony, that Romero oversaw the delivery workers' work, Def. Br. 4–5, 18 (collecting plaintiffs' testimony).

Plaintiff Rosales worked as a cook at Spice Symphony.  Rosales Dec. ¶ 9; Tr. 135.

## II.   Recordkeeping and Documentary Evidence

The Court finds that, during the relevant period, defendants failed to make, keep, and preserve complete and accurate records of the hours plaintiffs worked, but did keep accurate records of the wages paid to plaintiffs, to the extent that the records produced address the period of time the Court finds plaintiffs worked.  *See infra* section III.  This finding is based principally on the Court's close analysis of the purported wage and hour records defendants have produced, but also on plaintiffs' credible testimony that they worked hours not reflected in the records produced by defendants.

Defendants produced four primary types of records containing information about plaintiffs' hours worked.  First, defendants produced printouts, in spreadsheet format, of what defendants stated was their pay register.  Ex. A ("Pay Register").  The header of the Pay Register lists the restaurant's name and address, as well as the date, "3/01/2015."  The header for each plaintiff's payroll register says "Spice Symphony – Payroll Register," and lists the employee's name, ID number, and job title, which for the delivery workers says "Tip Employee Delivery."  For Gonzalez, there is also a notation "PT," presumably indicating that he was a part-time employee.  The rows in the Pay Register each cover a specific period of time, and the columns contain information purporting to show the days worked, regular hours worked, "OT" [overtime] hours worked, regular and overtime wage rate per hour, regular and overtime wages paid, tips earned, and the pay date.  Plaintiffs were never shown the Pay Register.  Tr. 330 (Rodrigues).

Second, defendants produced photocopies of pages from a physical notebook or journal which plaintiffs signed in order to receive their weekly pay.  Ex. A ("Pay Journal").[5]  The Court addresses the contents of the Pay Journal below.

Third, for certain plaintiffs—Hernandez, Rodriguez, and Rosales—defendants produced time sheets, which were handwritten charts purporting to indicate the hours worked each day and each week by plaintiffs, as well as the pay plaintiffs received, both from the restaurant and, for the delivery workers, from tips.  Exs. B & T ("Time Sheets").

Fourth, defendants produced tip receipts, which were signed by plaintiffs, indicating the amount of tips the delivery workers received.  Ex. C ("Tip Receipts").  The Tip Receipts have a date and time on them indicating the time and date they were printed.  Tr. 242–43, 273 (Rodrigues).

Defendants testified that the records were created as follows.  Leo recorded the hours plaintiffs worked on white sheets of paper, marking down the time each day that plaintiffs began and ended their work, as well as when they would start and end breaks during the day.  Leo provided these white sheets to Chaouhan on Mondays; on Tuesdays, Chaouhan and Rodrigues used the white sheets to input the data into the time sheets.  Rodrigues then inputted the data from the time sheets into the Pay Register to calculate plaintiffs' wages.  This process took place weekly.  Tr. 236–37 (Rodrigues testifying that he inputted the data into the pay register weekly from the Time Sheets and Pay Journal), 345–48 (Leo testifying about the process), 382–83 (Chaouhan same).  The white sheets containing the original start and stop times for plaintiffs'

---

[5] At trial, defendants introduced the physical copies of these journals, Exs. R & S, to which witnesses were asked to refer in their testimony.

working hours and break times were discarded after the information was transferred into the Time Sheets.  Tr. 346 (Leo), 382–383 (Chaouhan).

The Court credits as accurate the amount of money paid to plaintiffs, by defendants, as indicated in the Pay Journal and Tip Receipts.  That is because plaintiffs effectively adopted this information as accurate.  As to the Pay Journal, plaintiffs were required to sign it weekly to receive their weekly pay.  *See infra* section IV.A.  And at trial, all plaintiffs—except Hernandez[6]—acknowledged that the signatures in the Pay Journal were theirs, and that they had been paid the amount listed in the Pay Journal alongside their signatures.  Pl. Br. 8 (plaintiffs concede they were paid the amounts listed in the Pay Journal).  Plaintiffs also were required to sign their tip receipts to receive their tip pay, which they did daily.  Plaintiffs generally acknowledged as authentic their signatures on the tip receipts, and that they had been paid the amount of tips listed on the receipts.  *See infra* section IV.A.  Because the Court finds accurate the amounts indicated in the Pay Journal and on the tip receipts, the Pay Register is also accurate to the extent that it replicates or aggregates this data.[7]

---

[6] The Court does not credit Hernandez's testimony that he is unable to authenticate the signatures in the Pay Journal bearing his name for those entries indicating a pay amount other than the $250 per week he declared that he received.  Tr. 183–89.  The Court finds that these were Hernandez's signatures.  The Court discounted Hernandez's overall credibility, to a degree, as a result of his evasiveness on this point.  Other plaintiffs testified, credibly, that discrete signatures alongside certain of their pay periods were not theirs and appeared to have been filled in by others, while not making this claim globally or disputing that the amount of money listed as paid in the Pay Journal alongside each week accurately reflects the amount they were paid.  *See, e.g.*, Tr. 78–80 (Rodriguez testifying that most were his signatures).

[7] The Court is presently aware of a few discrepancies between the Pay Journal and Tip Receipts, on the one hand, and the Pay Register, on the other.  *See, e.g.*, Pay Register and Pay Journal for Rosales for pay periods beginning July 7 and July 14, 2014 (listing in Pay Register payment of standard weekly wages, while Pay Journal reflects additional wages); Pay Register and Pay Journal for Gonzalez for pay periods beginning January 6, 2014 (Pay Register fails to include pay data for this period).  The Court accepts the data in the Pay Register, a derivative record,

Significantly, the Court finds that, at the times that plaintiffs signed the Pay Journal, it contained only a subset of the information that appeared in it as of the time of trial. Plaintiffs' testimony was generally consistent that, at the time they signed the Pay Journal, it contained their names, the date period for which they were being paid, the date on which they were being paid, and the amount they were being paid. *See, e.g.*, Tr. 80 (Rodriguez testifying that the Pay Journal listed the date, the amount paid, and his signature).

The Court does not, however, credit that, at the time it was signed, the Pay Journal contained other handwritten notations—notations plaintiffs deny were present at the time they signed it. These notations fall into several categories. First, there are notations as to each plaintiff's purported hourly pay rate. These rates are expressed in dollar amounts following an "@" symbol, generally with one dollar amount following the words "Reg. Hrs. @" and another following "OT Hrs. @." Second, there are notations, in the form of tiny handwritten numbers, preceded by the letters "R" and "O" ("R&O Notations"), written either in the margins of the journal, or in between the columns reflecting the amount of pay paid to the plaintiff in question that week. These small numbers, defendants testified, were meant to capture the specific regular and overtime hours worked by the delivery worker plaintiffs that week. Tr. 327 (Rodrigues). Third, for Hernandez and Rodriguez, at the top of the journal page were block letters indicating "TIP EMPLOYEE."

For two independent reasons, the Court rejects as incredible defendants' claim that these three categories of markings were present at the time plaintiffs signed the Pay Journal. First, by their presentation and appearance, the markings, particularly the R&O Notations, suggest that

---

only insofar as it accurately captures data in the Pay Journal records that plaintiffs saw and adopted.

they were inserted at a later date, to provide ostensible documentary support for a defense that plaintiffs' hours were less than they claim in this lawsuit and that plaintiffs had agreed to work at the hourly pay rates indicated. The R&O Notations are crammed unnaturally into the margins of the Pay Journal. Unlike the categories of date, pay amount, and signature, there is no column header in the journal entries for these notations. Similarly, the markings indicating "Tip Employee" and the rates of pay for plaintiffs are shoehorned into tight crevices and penned awkwardly. They are situated either at the very top of the page, inexplicably above the pre-printed header reading "Notes/Memos" in the journal, or crammed underneath it.

Second, plaintiffs' near uniform—and credible—testimony was that the Pay Journal contained their name, the date, and the amount they were paid before they signed, but that it did *not* contain the other markings, a point on which they were emphatic. *See, e.g.*, Tr. 80–81 (Rodriguez testifying that the R&O notations, the indications that he was a tip employee earning specified regular and overtime rates were not present when he signed the Pay Journal), 152–54 (Rosales testifying that the Pay Journal listed the date and the amount he would be paid, and that he was sure that the hourly rates and the R&O notations were not there when he signed).[8]

The Court also does not credit the accuracy of the Pay Journal notations, Pay Register data, or Time Sheet data purportedly reciting the number of hours—regular hours and overtime hours—that plaintiffs worked during a given pay period. The Court does not credit defendants' testimony that Leo's practice was to write down, accurately, plaintiffs' start and end times, and the start and end time of plaintiffs' breaks each day, and to use that information to supply the

---

[8] Marco answered affirmatively the question: "Did you see anything else written, little numbers and letters on the left-hand side?" Tr. 314. However, Marco testified remotely via video conference, and it was not clear that he had a photocopy of any part of the Pay Journal in front of him when he answered the question. *See* Tr. 313. The Court therefore finds that his testimony does not support that the R&O notations were in the Pay Journal at the time he signed it.

data to the Pay Register, Pay Journal, and Time Sheets.  The Court discredits this testimony, and

finds the records inaccurate, for two related reasons.

First, although defendants claim to have precisely recorded plaintiffs' hours, the Pay

Register and Time Sheets show total weekly, and daily, hours for the delivery workers that are

implausibly identical, week in and week out.  Leo testified that while Romero's and Rosales's

schedules and hours were consistent and set, the delivery workers' hours (including their start

and end times), unsurprisingly, would vary.  Tr. 347–48.  Notwithstanding this, the Pay Register

reflects vast numbers of weeks in which a particular employee is reported to have worked the

identical number of hours, down to the tenth of an hour.  Thus, for example, the Pay Register

reports that in 13 weeks, Rodriguez worked 46.6 hours, and in eight weeks, he worked 41.1

hours; that in 13 weeks, Hernandez worked 44.4 hours, and in nine weeks, he worked 41.1 hours.

There is no persuasive explanation in the record for this metronomic consistency.  Leo attempted

to explain these results by stating that he rounded up the times plaintiffs worked—he gave as an

example rounding 11:20 p.m. to 11:30 p.m.  Tr. 347.  But such rounding would not produce such

peculiar, let alone recurrent, weekly totals.

The Time Sheets similarly reflect implausible results.  They report identical numbers of

hours worked—again, down to the fraction of an hour—on a *daily* basis, despite the fact that

plaintiffs and defendants all testified that the delivery workers' workdays ended at varying times

depending on the need on a given day for their services, and despite the fact that the restaurant

was open (and plaintiffs thus worked) longer hours on Fridays and Saturdays.  *See, e.g.*, Time

Sheets for Rodriguez (showing 6.8 hours worked each day for every week he worked a total of

41.1 hours, and 7.7 hours each day for every week he worked a total of 46.6 hours,[9] with no variation between Sundays–Thursdays and Fridays & Saturdays).

Second, as mentioned above, the odd-lot, fractionated total hours that these records report for the restaurant's workers are bizarre and unexplained. *See also, e.g.*, Pay Register for Romero (showing he worked 46.6 hours nearly every week); Pay Register for Rosales (same); Pay Register for Gonzelez (working 25 hours per week most weeks, and 20.8 hours per week in seven weeks). And Rodrigues himself, who maintained the books, struggled to explain them. In his testimony, he claimed to have difficulty deciphering some of the entries in the time sheets, and was unable to account for whether the odd decimal points represented minutes or hundredths of an hour. Tr. 279–83 (Rodrigues addressing time sheet entries for Rodriguez showing 8.23 hours per day, every day, for a full week, which he testified signified 8 hours and 23 minutes, whereas entries showing 6.25 hours worked each day a few weeks prior signified 6 and a quarter hours); 377–80 (Chaouhan testifying that 7.76 hours signified seven hours and 46 minutes, but agreeing with Rodrigues that 7.7 hours in the time sheets signified seven hours and seven minutes). Just as these odd increments cannot be explained by the rounding purportedly performed by Leo, they cannot be accounted for by Rodrigues's statement that he did not want to shortchange anyone. Tr. 280 (Rodrigues explaining that for 23 minutes of work, he gave workers credit for 30 minutes). That explanation does not make sense.

There is, however, an obvious and persuasive contrary explanation. The records' persistent use of odd-lot fractional hours alongside generally consistent weekly compensation figures that are reported in whole numbers powerfully suggests that the Time Sheets and Pay

---

[9] The Court notes that the math does not actually work for these hours, as six days of 6.8 hours worked yields 40.8 hours, not 41.1, and six days of 7.7 hours yields 46.2 hours worked, not 46.6.

Register (and corresponding notations in the Pay Journal) were fabricated after the fact.  This

pattern suggests that the number of hours purportedly worked each week were derived

retrospectively, by dividing the total amount of the employee's weekly wages by a fictitious

hourly wage.  This practice of jerry-rigging records, after the fact, in an attempt to deceive a

factfinder into finding that fixed weekly pay amounts had been paid in compliance with statutory

minimum and overtime wage requirements is, regrettably, all too familiar in litigated FLSA and

NYLL cases.  *See, e.g.*, *Solis v. Cindy's Total Care, Inc.*, No. 10 Civ. 7242 (PAE), 2012 WL

28141, at *8 (S.D.N.Y. Jan. 5, 2012) (describing this practice as the "backing-in" method).

Beyond these problems, as discussed further, *infra* section VI, the Court also finds that

the data concerning hours worked as reported in the Pay Register, Time Sheets, and Pay Journal

are contrary to plaintiffs' credible and consistent testimony as to the hours they worked at the

restaurant.[10]

For all those reasons, the Court finds that the Pay Journal R&O Notations, Pay Register,

and Time Sheets are inaccurate and unreliable in conveying the number of hours plaintiffs

worked at the restaurant.  It follows—and the Court addresses this point further *infra* section

IV.B—that these records are equally unreliable to the extent they purport to record plaintiffs'

regular and overtime hourly rates of pay.  Plaintiffs credibly testified to the contrary—that they

were paid sums per week that were generally constant, and that they were never paid according

to an agreed-upon hourly rate.

---

[10] Similarly, the Court does not credit the Pay Register's indication of the number of days
Gonzalez worked each week, as it is contrary to the Court's finding that he generally worked six
days per week—although occasionally he worked fewer days.  *See infra* section VI.A.1; *see also*
Tip Receipts for Gonzalez (showing, for example, he worked six days between 9/22/13 and
9/28/13, including 9/28/13, despite the Pay Journal and Pay Register not providing a date range
that includes 9/28/13).

A final category of records related to pay which Spice Symphony produced for trial was copies of checks that the restaurant used to pay Rosales during the last three months of his employment (July–September 2014), and to pay him a $400 advance for work to be performed. Ex. D; Tr. 153, 158, 161–62.  The memo portion of these checks presents several categories of information: the dates for which Rosales was being paid; occasionally, the number of days worked; and the description of Rosales as a "Part Time Employee," although, as discussed *infra*, Rosales was not a part-time employee.  *See infra* VI.A.3; Tr. 245–46 (Rodrigues was unable to explain why he repeatedly made the "mistake" of indicating that Rosales was a part-time employee on the checks).  The memo portion contained the inscription, "Responsible [or Resp.] For All Taxes."  Although Rodrigues testified that the restaurant was paying taxes on the wages it paid plaintiffs, it did not withhold taxes for plaintiffs' income. Tr. 246–47.  There was no testimony suggesting that Spice Symphony provided plaintiffs with tax documents reflecting their pay and/or hours worked.  *See* Rodriguez Decl. ¶ 21 (declaring that he never received a Form W-2); Marco Decl. ¶ 27 (same); Romero Decl. ¶ 17 (same); Rosales Decl. ¶ 21 (same).  The Court finds that the notation to the effect that Rosales was "[r]esponsible for all taxes," whatever Rodrigues's reasons for so writing, was devoid of legal significance and factually inaccurate.

## III.    Dates of Employment

The parties dispute the dates that a number of plaintiffs began working for Spice Symphony.  As explained below, the Court generally credits (with the exception of the testimony of Hernandez) plaintiffs' testimony as to their start dates, and does not credit defendants' contrary testimony.

Marco worked for Spice Symphony from March 2013 until September 20, 2013, and then from April 28, 2014 until May 13, 2014.  Marco Decl. ¶ 8; Pay Journal; Pay Register; Tip

14

Receipts.  While Marco expressed some uncertainty about the dates of his employment with

Spice Symphony during his live testimony, he was consistent that he began work in March 2013.

Tr. 301–03.

Rodriguez worked for Spice Symphony from April 2013 until March 9, 2014, and then

from May 12, 2014 until June 1, 2014.  Rodriguez Decl. ¶ 9; Pay Journal; Pay Register; Tr. 72–

74, 84; Ex. 4 (photograph of Cinco de Mayo celebration, May 5, 2013).

Gonzalez worked for Spice Symphony from December 2012 through January 25, 2014.

Gonzalez Decl. ¶ 6; Tr; 52, 55; Pay Journal; Tip Receipts; *see also* Pl. Br. 9 (adopting month of

January for end date).

Romero worked for Spice Symphony from September 24, 2012 through August 11, 2013.

Romero Decl. ¶ 7; Pay Journal; *see also* Pl. Br. 13 (adopting Pay Journal for end date).

Rosales worked for Spice Symphony from March 2013 until September 30, 2014.

Rosales Decl. ¶ 8; Tr. 135–36. Although the Pay Journal and copies of checks reflect payments

only for work through September 21, 2014, on September 30, 2014 he received payments for

work up through September 21, as well as an "advance," suggesting that he was still working at

Spice Symphony at the time.  Pay Journal; Ex. D; Tr. 153, 158, 161–62.  The Court therefore

credits his declaration that he worked until September 30, 2014.  Rosales Decl. ¶ 8.

Defendants claim that Gonzalez, Rodriguez, Rosales and Marco began working for Spice

Symphony at later dates in July 2013: Rodriguez and Rosales on July 1, 2013; Marco on July 10,

2013; and Gonzalez on July 15, 2013.  Rodrigues Aff. ¶ 7; Leo Decl. ¶ 7; Chaouhan Aff. ¶ 7.

Defendants base this testimony on their handwritten pay records and their purported memory.

Ex. A; *see* Tr. 253–55.  The Pay Journal records produced, however, begin in July 2013.  *Id.*  Yet

several plaintiffs credibly testified that they either were not required to sign a notebook for their

pay for some early portion of their tenure at Spice Symphony, Tr. 52 (Gonzalez), or that they signed, or may have signed, a different notebook when they first started working there, Tr. 57–58 (Gonzalez), 80 (Rodriguez), 151–52 (Rosales).  And Rodrigues conceded on cross-examination that he may have used another notebook before July 2013, but that he was not able to locate it when asked to produce it for this action.  Tr. 253–55.  The Court does not credit Rodrigues's or the other defendants' self-serving claim that these four plaintiffs all coincidentally began working during the period covered by the pay notebooks defendants were able to locate, and not before.

As for plaintiff Hernandez, the Court finds that he worked for Spice Symphony from September 1, 2013 until March 4, 2014, and then from April 28, 2014 until June 23, 2014, and that he worked only a half day on June 23, 2014.  Hernandez Decl. ¶ 6; Rodrigues Aff. ¶ 7; Leo Decl. ¶ 7; Chaouhan Aff. ¶ 7; Pay Journal; Tr. 316–17 (Rodrigues acknowledging June 23).  The Court does not credit Hernandez's testimony that he began working for Spice Symphony in May 2013.  Hernandez Decl. ¶ 6; Tr. 164.  For reasons explained further *infra* section X, the Court finds Hernandez's testimony at trial was incredible as to certain points, and the Court declines to credit his claim as to his start date.  Moreover, as to four other plaintiffs (Gonzalez, Rodriguez, Marco, and Rosales) defendants acknowledged that these plaintiffs began working at least by July 2013 based on their records covering that point forward, which plaintiffs had an opportunity to review.  There is, however, no documentary evidence that Hernandez worked in July or August 2013.  The Court accordingly does not credit that he worked in May–August 2013.

## IV.  Payment

### A.    Payment Practices

Plaintiffs received their regular weekly pay on Tuesdays.  Tr. 150 (Rosales), 372 (Rodrigues).  To receive such pay, plaintiffs signed the Pay Journal.  Tr. 150 (Rosales).  As the

Court has found, at the time the worker signed the Pay Journal, it accurately recited the worker's name, the dates for which he was being paid, and the amount.

In addition, each day, the restaurant paid delivery workers the tips earned on deliveries paid by credit card.  Delivery workers received tips, one worker at a time, at or near the end of their work hours.  The Court finds that while sometimes the workers, upon receiving their tips, stopped work and left the restaurant immediately, on other occasions, they resumed work (*e.g.*, cleaning the kitchen).  To receive their tips, delivery workers signed a Tip Receipt.  The Tip Receipt listed the date and time the receipt was printed, and the amount of the tip.  Plaintiffs acknowledged that the amount of tip indicated on a Tip Receipt accurately reflected the amount of tip they received.  Tips were paid in cash.  Tr. 36–42 (Gonzalez), 95–96 (Rodriguez), 179–81 (Hernandez), 310–11 (Marco).

### B.      Pay Rates and Wage Payments

#### 1.      Delivery Workers

The Court finds that Hernandez, Marco, and Rodriguez were generally paid a weekly rate of pay, although the weekly rate per worker, while generally constant, was not always so.  As to Gonzalez, the Court finds that he was generally paid a fixed daily rate of pay.

The delivery workers each attested that they were paid a fixed weekly rate of pay. Gonzalez Decl. ¶¶ 13–14 ($175 per week); Rodriguez Decl. ¶¶ 14–16 ($250 per week until December 2013; $280 per week from December 2013 to March 2014; $300 per week from May 2014 to June 2014); Hernandez Decl. ¶ 18 ($250 per week); Marco Decl. ¶¶ 20–21 ($250 per week until July 2013, and $250 to $330 per week thereafter).  This attestation to the effect that weekly pay was constant proved an overstatement, as plaintiffs admitted at trial that the Pay Journal records of cash received were accurate, and the Pay Journal reflects occasional weekly fluctuations.  However, for each worker, the variations in weekly pay were modest: they

17

typically reflected deviations in standard, round-number increments—frequently $25, $30 or $50—from the worker's most-frequent weekly pay amount. *See, e.g.*, Pay Journal for Hernandez (nine entries for $250, 13 entries for $280); Pay Journal for Rodriguez (eight entries for $250, 13 entries for $300); *but see* Pay Journal for Marco (no generally consistent entries, though there are only eight total entries).

It is possible that the variations in pay loosely reflected that the worker had worked more (or fewer) hours in a given week than his norm, justifying a modest upward or downward change in pay for the week at issue. But, as described earlier, the Court finds that defendants did not maintain contemporaneous or accurate records of the precise hours that the delivery workers worked, or make any attempt to assure that weekly pay was keyed to a pre-set hourly rate. Therefore, the Court rejects defendants' claim—based on the annotations added after-the-fact to the Pay Journal as to the workers' ostensible hours worked and pay rates—that weekly pay for each worker reflected an hourly rate of $6 per hour, and an hourly overtime rate of $9 per hour, for each worker. The Court similarly does not credit defendants' testimony to that effect.

The Court therefore makes the following findings as to the pay that plaintiffs received while employed at Spice Symphony.

All delivery workers were paid the amounts listed in the Pay Journal for the weeks covered there.

For the dates as to which the Court has found plaintiff delivery workers were employed, but as to which there is no corresponding entry in the Pay Journal, the Court finds that Rodriguez was paid $250 per week (mode payment for early period of employment), and Marco was paid $250 per week (amount he declared he received).

The Court finds that Hernandez was not paid wages for his work for his last two weeks of work—between June 9 and June 23, 2014.  *See* Pay Journal (no signatures for pay); Tr. 166 (Hernandez testifying that he did not get paid for his last two weeks of work); 317–18 (Rodrigues acknowledging that where there is no signature Hernandez did not receive pay).  The Court finds that his regular weekly salary for those two weeks would have been $300 (the mode payment amount during Hernandez's second tour of duty with Spice Symphony).

As to Gonzalez, however, the Court finds that he was paid a fixed daily rate of $25 per day.  Gonzalez's declaration credited defendants with paying him more generously than did the Pay Journal.  Rather than the $175 per week he declared he received, by far the most common recorded weekly payments were for $150 or $125.  Pay Journal for Gonzalez (nine entries for $150, seven entries for $125).  As discussed further *infra* section VI.A.1, the Court does not credit Gonzalez's testimony that he worked seven days per week, but rather finds that he generally worked six days per week (like the other delivery workers).  Finding that Gonzalez earned a daily wage of $25 per day best accounts for the uniform variations in his pay of increments of $25 and the conflicting evidence regarding his schedule.  For the dates as to which the Court has found Gonzalez was employed, but as to which there is no corresponding entry in the Pay Journal, the Court finds that he was paid $25 for each of six days of work.  *See* Pay Journal (mode payment $150 per week).

### 2.    Romero

The Court finds that Romero was paid a fixed weekly salary of $400 per week for the duration of his employment up through July 21, 2013, and $450 per week from July 22 to August 11, 2013.[11]  Pay Register; Pay Journal.  The Court does not credit Romero's testimony that he

---

[11] Romero also testified that he occasionally assisted in making deliveries, earning $20–30 in tips per month. Tr. 112–13.

was paid $425 per week between February 2013 and July 2013, because it is inconsistent with the portions of Pay Journal alongside which he signed for the first three weeks in July 2013. Tr. 118–19 (Romero). The Court finds that this salary was a fixed weekly salary. Contrary to what the annotations in the Pay Journal indicate, the Court finds this pay did not reflect an hourly pay rate (the Pay Register reflects a regular pay rate of $8 per hour and $12 per overtime hour, and, for July 22 to August 11, 2013, regular and overtime rates of $9 per hour and $13.50 per hour, respectively; the Pay Journal has a notation at the top reflecting a regular rate of $8 per hour and $13.50 per overtime hour). The Court rejects these notations as post-hoc additions with no basis in reality for the same reasons it rejected the similar notations as to the delivery workers. Although Romero was paid a fixed weekly salary, the Court does not credit defendants' declarations that defendants and Romero "had a clear and mutual understanding . . . that [his] weekly pay compensation was for all hours worked (whether many or few)." Rodrigues Aff. ¶ 23; Leo Decl. ¶ 22; Chaouhan Aff. ¶ 23. These assertions are conclusory, unsupported by documentary evidence or a description of the concrete circumstances that purportedly gave rise to such a "clear and mutual understanding."

### 3. Rosales

The Court finds that Rosales, too, was paid a fixed weekly salary. The Court finds that Rosales was paid the amounts indicated in the Pay Journal each week,[12] and that he paid a fixed weekly rate of $500 per week from July 1 to November 3, 2013, $525 for the week beginning November 4, 2013; $550 per week from November 11, 2013 to April 6, 2014; $575 per week from April 7 to August 31, 2014; and $650 per week from September 8 to September 30, 2014. Pay Journal. The Court further finds that Rosales was paid a weekly salary of $500

---

[12] Although there is no Pay Journal entry for the week beginning July 21, 2014, the Court credits the Pay Register that Rosales was paid $527 for that week. *See* Ex. D.

per week from March 2013 until June 30, 2013, during which period the Court has found Rosales worked but whose wage payments are not reflected in the Pay Journal records. As with the other workers, the Court does not credit the notations in the Pay Register to the effect that Rosales's weekly pay reflected an agreed-upon hourly and overtime rate. And for the reasons stated above with respect to Romero, the Court does not credit defendants' declarations that defendants' and Romero "had a clear and mutual understanding . . . that [his] weekly pay compensation was for all hours worked (whether many or few)." Rodrigues Aff. ¶ 23; Leo Decl. ¶ 22; Chaouhan Aff. ¶ 23.

The Court finds that Rosales was paid an "advance" of $400 on September 30, 2014, but that he was not paid his regular wages for his work between September 22 and September 30, 2014. Ex. D; Pay Journal (no entry for September 22 to September 30, 2014).

**V.      Notice**

**A.      Compensation Discussions**

The Court here addresses the oral conversations between plaintiffs and defendants regarding the manner in which plaintiffs would be compensated. This discussion is relevant only to whether defendants are entitled to claim a tip credit with respect to the delivery workers; accordingly, the Court addresses only those workers. As the Court has previously found, Leo hired the delivery workers. Leo had the initial conversations with plaintiffs about their pay when they were hired, but Chaouhan finalized the pay arrangements with plaintiffs and had the final say over pay. Tr. 356–57.

The Court finds that, at the time they were hired, the delivery workers were informed that they would be paid a fixed weekly rate of pay,[13] and that they would receive tips. However, as

---

[13] For Gonzalez, a fixed daily rate of pay.

discussed *supra* section II, the Court does not credit defendants' testimony, or their purported documentary evidence, that the parties ever agreed to an hourly rate of pay, let alone that any plaintiff's weekly pay was ever calculated based on his hours worked that week.  For related reasons, the Court does not credit Leo's declaration to the effect that, in the hiring interviews with all delivery workers, he informed them that they would be paid an hourly rate and an overtime rate, in addition to tips, which would be used to offset defendants' minimum wage obligations.  Chad Decl. ¶ 17; Tr. 361–62.  That testimony was incredible for several independent reasons.  First, and most significant, Leo purported to have notified plaintiffs of a compensation system (involving hourly rates of pay) that the Court has found did not exist. Second, the claim is implausible, unsupported by any contemporaneous documentary evidence, and was refuted by plaintiffs' credible testimony.  Third, Leo's two co-defendants suspiciously attempted to corroborate this account by supplying, using identical words, testimony as to what was purportedly said by Leo to plaintiffs during their hiring interviews, even though these co-defendants were not present for these interviews.  *See* Tr. 320–22 (striking Rodrigues affidavit testimony as hearsay); 383–87 (same as to Chaouhan, who denied being involved in finalizing the workers' pay when they were initially hired, contradicting Leo's testimony).

Relatedly, the Court finds that plaintiffs were not informed that their tips would be used to *offset* defendants' minimum wage obligations.  Gonzalez Decl. ¶ 15 (denying that he was so notified); Hernandez Decl. ¶ 20 (same); Rodriguez Decl. ¶ 18 (same); Marco Decl. ¶ 23 (same). The Court finds that Leo informed the delivery workers that the restaurant would pay them a weekly wage, and that they would receive tips from customers.  However, the Court rejects Leo's testimony that he informed the workers that these tips would serve as an *offset* to minimum

wage and overtime obligations.  Defendants' non-compliance with wage and hour laws makes it highly unlikely that Leo was punctilious as to this notice requirement of the law.

Notably, under questioning by the Court, Leo recounted the discussions he purportedly had with prospective delivery workers as to pay arrangements.  He testified:  "I would say base salary would be $6 per hour and then including your tips would cover your entire wage, your entire salary."  Tr. 362.  The Court does not credit as accurate Leo's statement either that he notified the workers of a $6 per hour wage or that he told them the "tips would cover your entire wage, your entire salary."  But even if those words had been used, this inexact formulation would have been inadequate to communicate to a delivery worker that the tips would serve as an offset to the statutory minimum-wage entitlement, a concept that Leo's locution nowhere mentions.  As for Ndiaye, while the Court credits his testimony, as a former delivery worker, that he received tips and wages from the restaurant, Tr. 337–38, the Court does not credit the aspect of his declaration, which tracks nearly verbatim defendants' declarations, to the effect that he was told that he would receive tips as an offset to defendants' minimum wage obligations. Ndiaye Decl. ¶ 9.

### B.    Government Poster

Resolving the conflicting testimony on this point, the Court finds that while defendants at some point posted federal and state Department of Labor ("DOL") posters in the restaurant, in English and Spanish, they did not do so during the period when plaintiffs worked at the restaurant.  The Court credits the uniform testimony of plaintiffs on this point.  Gonzalez Decl. ¶ 22; Rodriguez Decl. ¶ 25; Hernandez Decl. ¶ 27; Marco Decl. ¶ 31; Romero Decl. ¶ 21; Rosales Decl. ¶ 25.

Defendants placed into evidence a photograph of posters, in both languages, containing general information regarding the minimum wage rate, the minimum wage laws, overtime laws,

23

and tip/meal-credit allowance requirements.  Ex. E; *see also* Def. Br. 29 (citing the poster

available at http://www.labor.ny.gov/formsdocs/wp/LS207.pdf as exemplifying the type of

poster which was present in the restaurant, as the text in Exhibit E is not legible).  Defendants

and their witnesses also testified that the poster was posted in the kitchen at Spice Symphony.

But the Court does not credit defendants' testimony that the posters have been posted in the

restaurant's kitchen at all times since the restaurant opened, and have been updated every time

the minimum wage, or related laws, have changed.  Rodrigues Aff. ¶ 10; Leo Decl. ¶ 11;

Chaouhan Aff. ¶ 10; Tr. 247–48.  Notably, while defendants' other witnesses, all current or

former employees, testified that "Department of Labor notices *were* visibly posted on the

premises," Arnely Aff. ¶ 3; Ndiaye Aff. ¶3; Nagarajah Aff. ¶ 3; D'Silva Aff. ¶ 3; Jean Aff. ¶ 3;

Shete Aff. ¶ 3 (emphasis added), none provided any detail about the time frame during which

they remember the posters being there.  *See also* Tr. 213–16 (Arnely, a line cook, initially

testified at deposition that he did not recall whether there were posters in the kitchen).

### C.      Wage Notice

Defendants did not give plaintiffs a notice, in English or in Spanish, upon their hiring or

anytime thereafter, which contained information regarding their employer's name, address, and

phone number; the employees' rates of pay and basis of pay (*e.g.*, hourly, daily, weekly, shift,

piece, salary, or other); the allowances Spice Symphony would be claiming against their

minimum wage; and the employees' regular pay day.  Gonzalez Decl. ¶ 21; Rodriguez Decl.

¶ 24; Hernandez Decl. ¶ 26; Marco Decl. ¶ 30; Romero Decl. ¶ 20; Rosales Decl. ¶ 24.

### D.      Wage Statements

Defendants did not provide plaintiffs with a statement, along with their wage pay,

containing information regarding the dates of work covered by that payment; the employee's

name; the employer's name, address, and phone number; the employee's rate of pay and the

basis of payment, including the employee's regular and overtime rates of pay and the regular and overtime hours worked by the employee during the pay period; gross wages; deductions; allowances claimed against the employee's minimum wage; and net wages.  As described *supra* section II, the Court credits defendants' testimony that the Pay Journal signed by plaintiffs to receive their pay contained the employee's name, the dates covered by the payment, and the gross wages earned.  However, the Court does not credit that the Pay Journal recited the employee's rate of pay, the employee's designation as a tipped employee, or the hours (regular or overtime) worked by plaintiffs.  Moreover, plaintiffs were not provided a separate statement containing such information, or a copy of the pages of the Pay Journal which plaintiffs signed. Gonzalez Decl. ¶¶ 18–19; Rodriguez Decl. ¶¶ 21–22; Hernandez Decl. ¶¶ 23–24; Marco Decl. ¶¶ 27–28; Romero Decl. ¶¶ 17–18; Rosales Decl. ¶¶ 21–22.

## VI.   Hours Worked

For the reasons stated *supra* section II, the Court does not credit defendants' documentary evidence purporting to record plaintiffs' hours worked.  The Court also does not credit defendants' testimony that they routinely locked up the restaurant at 11:15–11:30 p.m. Sundays through Thursdays, and at 12 a.m. on Fridays and Saturdays, and that restaurant employees regularly left the restaurant 20–30 minutes before management locked up.  Rodrigues Aff. ¶ 9; Leo Decl. ¶ 9; Chaouhan Aff. ¶ 9; *see also* Tr. 348–56 (Leo testifying generally regarding plaintiffs' hours, though noting that the delivery workers' hours varied).  This claim is contrary to plaintiffs' consistent and credible testimony that they often worked beyond those hours. Gonzalez Decl. ¶ 10; Tr. 18; Rodriguez Decl. ¶ 10; Tr. 90–91; Hernandez Decl. ¶¶ 13–14; Tr. 169–72; Marco Decl. ¶¶ 16–17; Tr. 307–10; Romero Decl. ¶ 10; Tr. 108–09; Rosales Decl. ¶ 10; Tr. 137–38.  It is also impeached by other documentary evidence offered by defendants, namely, the tip receipts that frequently reflect timestamps after those purported closing times, *see e.g.*,

Tip Receipts for Hernandez (timestamp for 32 out of 88 dates falling on Sunday through Thursday after 11:30 p.m.); Tip Receipts for Rodriguez (timestamp for 15 out of 27 tip receipts for dates falling on Fridays and Saturdays after 12 a.m.).

Because there are no accurate records showing the precise times plaintiffs worked each day, the Court of necessity makes findings regarding plaintiffs' general work schedules (that is, when they typically began and ended work each day), and the extent to which plaintiffs received any breaks during the workday.

### A.   General Schedule

#### 1.   Delivery Workers

The delivery workers had a schedule that varied on a day-to-day basis, particularly with respect to the time they stopped working each night. *See, e.g.*, Tr. 90–91 (Rodriguez); 309–10 (Marco); Tip Receipts (showing widely varying times, *e.g.*, Rodriguez receipts range from 10:25:17 p.m. to 12:38:36 a.m.); Def. Br. 6.

The Court generally credits plaintiffs' testimony regarding their work schedules over defendants' general testimony, Tr. 348–56 (Leo), and defendants' propounded documentary evidence, which the Court has discredited.

Based on the testimony viewed in totality, and the inferences that can be drawn from the timestamps on the Tip Receipts, the Court finds that the delivery workers worked the following schedules:

- Rodriguez: 11 a.m. to 11:45 p.m. Sundays, Tuesdays, Wednesdays, and Thursdays; and 11 a.m. to 12:15 a.m. Fridays and Saturdays.

- Hernandez: May 2013–March 2014: 11 a.m. to 11:45 p.m. Sundays, Mondays, Wednesdays, and Thursdays; 11 a.m. to 12:15 a.m. Fridays and Saturdays; April 2014–June 23, 2014: 11 a.m. to 11:45 p.m. Sundays through Thursdays, and 11 a.m. to 12:15 a.m. on Fridays.

- Gonzalez: 5 p.m. to 11:45 p.m. Sundays through Thursdays; 5 p.m. to 12:15 a.m. on Fridays and Saturdays.[14]

- Marco: 11 a.m. to 11:45 p.m. on Mondays, Tuesdays, Wednesdays and Thursdays; 11 a.m. to 12:15 a.m. on Fridays and Saturdays.

The delivery workers testified that they worked slightly different schedules than those found by the Court above.  Specifically, they testified as follows:

- Rodriguez: 11 a.m. to 11 p.m. Sunday, Tuesdays, Wednesdays, and Thursdays; and 11 a.m. to 12 a.m. or 12:15 a.m. Fridays and Saturdays.  Rodriguez Decl. ¶ 10; Tr. 90–91 (testifying he often worked later).

- Hernandez:
  - May 2013–March 2014: 11 a.m. to 11:45 p.m. Sundays, Mondays, Wednesdays, and Thursdays; 11 a.m. to 12:30 a.m. or 12:45 a.m. Fridays and Saturdays; April 2014–June 23, 2014: 11 a.m. to 11:30 p.m. Sundays through Thursdays, and 11 a.m. to 12 a.m. on Fridays.  Hernandez Decl. ¶¶ 13–14; Tr. 169–72.

- Gonzalez: 5 p.m. to 11:45 p.m. Sundays through Thursdays; 5 p.m. to 1 a.m. on Fridays and Saturdays.  Gonzalez Decl. ¶ 10; Tr. 18.

- Marco: 11 a.m. to 11:30 p.m. on Mondays, Tuesdays, Wednesdays and Thursdays; 11 a.m. to 12 a.m. on Fridays and Saturdays.  Marco Decl. ¶ 16; Tr. 307–10.

Hernandez, Rodriguez, and Marco further declared that they would work 15–30 minutes beyond their usual schedules.  Hernandez Decl. ¶ 15; Rodriguez Decl. ¶ 11; Marco Decl. ¶ 17.

---

[14] Although the Court makes these findings as to the times Gonzalez started and ended work each day, the Court does not credit his testimony that he worked seven days per week.  Tr. 25, 43–44. This testimony, while not impossible, is less plausible in light of Gonzalez's testimony that he also worked another part-time job, Tr. 17, 43, is contrary to defendants' contrary testimony that he worked five days per week, Tr. 352–53 (Leo), and appears to conflict with the amount of money he was actually paid on a weekly basis, as opposed to the amount he declared he was paid, *see supra* section IV.B.1.  Therefore, the Court finds that for each week reflected in the Pay Journal, the number of days Gonzalez worked equals his total weekly salary divided by 25.  For dates not recorded in the Pay Journal, the Court finds that he worked six days per week.  The Court makes this finding based on the mode number of days the Court finds he worked based on the data recorded in the Pay Journal ($150 divided by $25 per day), and because it is the same number of days per week all of the other delivery workers worked. *See also*, *e.g.*, Tip Receipts for 9/22/13–9/28/13 (showing six days worked).

The Court's estimates are necessarily in the form of approximations, but they reflect just and reasonable inferences from the available evidence. The schedules found above reflect, for certain plaintiffs, a later ending time, and in some cases, an earlier ending time, than plaintiffs themselves recalled. This does not reflect differing credibility determinations as between plaintiffs. Rather, the Court finds that there is no basis to find that certain delivery workers generally worked later than others. Rather, the Court believes that the variations among these workers' testimony reflect differing good-faith approximations and recollections of their similar experiences. Accordingly, the Court finds that the delivery workers generally left around the same time as one another each day.

The Court's finding of 11:45 p.m. as the end time for Sundays through Thursdays, and 12:15 a.m. for Fridays and Saturdays reflects an inference from multiple pieces of evidence. The Court credits defendants' testimony that the restaurant officially closed for business at 11 p.m. Sundays through Thursdays and 11:30 p.m. on Fridays and Saturdays. However, the Court finds that the delivery workers often worked beyond those times, either completing deliveries, taking out the garbage, or performing cleaning duties in the kitchen and in the basement. The Court finds, however, that the delivery workers did not clean the kitchen for one hour after completing their delivery shifts every day, but rather, multiple times per week, spent approximately 30–60 minutes cleaning the kitchen. *See, e.g.*, Tr. 306–12 (Marco testifying that it took approximately 45 minutes to clean the kitchen, and that the kitchen was cleaned every night, though sometimes the cleaning would be started by a subset of delivery workers while others were still completing deliveries).

The timestamps on the Tip Receipts submitted by defendants also shed light on plaintiffs' hours. Plaintiffs consistently testified that they received their tip receipts near the end of their

time working:  Sometimes they received their tips and immediately left the restaurant, and sometimes they received their tips and returned to clean the kitchen.  *See, e.g.*, Tr. 310–11 (Marco); *see also* Tr. 244 (Rodrigues testifying that the timestamps were generated, and delivery workers were paid tips, at the end of the shifts).  Although the Tip Receipts received in evidence are not comprehensive for each delivery worker, based on the large number of receipts submitted (369 legible receipts), and defendants' incentive to submit any and all receipts in their possession, the Court finds that the timestamps on the tip receipts in evidence fairly represent the times plaintiffs received their tips each day.

The tip receipts for the delivery workers show the following average times[15]:

- Marco: 11:40:26 p.m. Friday & Saturday; 11:25:07 p.m. Sunday–Thursday.

- Rodriguez: 12:02:31 a.m. Friday & Saturday; 11:24:12 p.m. Sunday–Thursday.

- Hernandez: 11:57:02 p.m. Friday & Saturday; 11:23:39 p.m. Sunday–Thursday.

- Gonzalez: 11:57:34 p.m. Friday & Saturday; 11:06:39 p.m. Sunday–Thursday.

The consistency of the averages reflected on the Tip Receipts for three out of four of the delivery workers for each category (Friday/Saturday and Sunday–Thursday) suggests that those times were the most typical as to when a delivery worker received his tips.  In arriving at the conclusions above, the Court considered plaintiffs' approximations in their declarations, and

---

[15] To calculate these averages, the Court's staff entered the dates and times for all Tip Receipts submitted in Ex. C into a spreadsheet using Microsoft Excel, and used the "average" function to perform an average for (1) the dates that fell on a Friday or Saturday, and (2) the dates that fell on Sundays–Thursdays.  For dates which had multiple receipts, the average was calculated using only the later time.  One entry was excluded as an obvious aberration that could unduly impact the average (Marco, 9/19/13, 3:15 p.m.).  To ensure that the average function calculated the correct average time, the times entered into the spreadsheet were inverted as to whether they were a.m. or p.m.  For example, if the tip receipts showed 11 p.m., 11:30 p.m. and 12 a.m., they were input into the spreadsheet as 11 a.m., 11:30 a.m. and 12 p.m. respectively, so as to properly produce an average of 11:30, and not 3:30.  Seven tip receipts were not used because either the date, time, or both were illegible.

their testimony that they often returned to work to clean the kitchen after receiving their tips, and therefore found general end-of-work times that are approximately 15–20 minutes after the average timestamp on the tip receipts.

The Tip Receipts also served as the basis for the Court's rejection of Hernandez's testimony that he worked materially later during his first stint as a delivery worker (May 2013–March 2014) than when he returned to Spice Symphony in April 2014–June 2014. *See* Hernandez Tip Receipts (average Friday/Saturday of 11:57:20 p.m. and 11:55:29 p.m. respectively; average Sunday–Thursday of 11:24:27 p.m. and 11:20:03 p.m. respectively).

### 2. Romero

Romero worked a regular weekly schedule, on Mondays, Wednesdays, Thursdays, Fridays, Saturdays, and Sundays.  Romero Decl. ¶ 10.  The Court credits Romero's declaration and live testimony to the effect that he began work each day at 10 a.m., *id.*; Tr. 107, when, he explained, he opened the restaurant.  The Court finds it reasonable to infer that the restaurant opened for employees at least one hour before it opened to the public at 11 a.m. each day.  *See* Tr. 107.

However, the Court finds that the times Romero typically finished work were earlier than he stated in his declaration, based on aspects of his live testimony.  Romero's declaration states that he finished work at 12 a.m. on Mondays, Wednesdays, and Thursdays; 1 a.m. on Fridays and Saturdays; and 11 p.m. on Sundays.  But he testified that he closed the restaurant on no more than four occasions; that approximately one time per month he helped the delivery workers clean the kitchen, staying as late as 1 a.m., and that otherwise he left before the delivery workers and Rosales.  Tr. 107–09.  He testified that he normally left at 11 p.m.  Tr. 108.

The Court therefore finds that the evidence supports a just and reasonable inference that Rosales regularly finished work at 11 p.m. on Sundays, Mondays, Wednesdays, and Thursdays,

and that, given his responsibilities overseeing the delivery workers, he finished work at 12 a.m. on Fridays and Saturdays.

### 3.    Rosales

Rosales worked a regular weekly schedule, on Sundays, Tuesdays, Wednesdays, Thursdays, Fridays, and Saturdays.  Rosales Decl. ¶ 10.  The Court credits his declaration and testimony that he generally worked from 11 a.m. until 11 p.m. Sundays, Tuesdays, Wednesdays and Thursdays, and from 11 a.m. until 12 a.m. Fridays and Saturdays.  Rosales Decl. ¶ 10; Tr. 137–38.

### B.    Breaks

As discussed *supra* section II, the Court does not credit defendants' documentary evidence with regard to plaintiffs' hours worked, including insofar as these documents purport to reflect breaks from work during the workday.  *See* Tr. 258–59 (Rodrigues describing that Leo or Chaouhan recorded the times plaintiffs started and stopped work each day, as well as the time plaintiffs would go on break and stop break).  The Court finds, however, that plaintiffs (with the exception of Gonzalez) were afforded a midday break—albeit of shorter duration than that claimed by defendants—but not a dinner break.

Defendants testified that all plaintiffs except Gonzalez had a two-hour, midday break between 3 p.m. and 5 p.m.  Rodrigues Aff. ¶ 9; Leo Decl. ¶ 9; Chaouhan Aff. ¶ 9; Tr. 258–59 (Rodrigues); *see also* Ndiaye Aff. ¶ 2; Tr. 341–42 (Ndiaye).  Although some plaintiffs denied having any breaks whatsoever, Hernandez Decl. ¶ 16; Romero Decl. ¶ 11; *see also* Gonzalez Decl. ¶ 11, others acknowledged that they were supposed to receive regular breaks but in reality these did not occur as promised because of interruptions from work, *see* Rodriguez Decl. ¶ 12 (was supposed to get meal breaks, but did not because of interruptions); Marco Decl. ¶ 18 (received 15-minute breaks, although he was supposed to receive one hour); Rosales Decl. ¶ 11

31

(received 30-minute breaks, but would be interrupted by work two times per week); Tr. 102–03
(Rodriguez acknowledging that lunches would be provided by restaurant, but that lunch
commonly interrupted by the need to make deliveries); 140–41 (Rosales acknowledging a
general two-hour recess, although noting that he typically used only approximately 40–50
minutes of the break, working the rest to prepare food, cut vegetables, and bring things up from
the basement).

The Court therefore finds that between the hours of 3 p.m. and 5 p.m. each day, plaintiffs
had break time which they in theory could use for their own purposes, but that some of that time
tended to be interrupted by work tasks. The Court finds that the evidence supports a just and
reasonable inference that the delivery workers (except for Gonzalez[16]), and Romero, whose work
was related to that of the delivery workers, generally had 60 minutes of break time between 3
p.m. and 5 p.m., and that Rosales generally had 45 minutes of break time, which plaintiffs were
free to use for their own purposes.

The Court finds that plaintiffs did not have a dinner break that regularly exceeded 20
minutes. Rodrigues testified that in addition to the midday break, plaintiffs also had a dinner
break that lasted 30–40 minutes. Tr. 286–87. Although the Court credits Rodrigues's testimony
that plaintiffs took time to eat dinner during their shift when they were hungry, the Court does
not credit that these breaks lasted as long as 30-40 minutes. Rather, the Court finds, plaintiffs
were allowed to, and did, take short breaks to eat dinner when their work so permitted, but that
such breaks were informal, did not typically last more than 20 minutes, and that during the
breaks plaintiffs needed to be prepared to work if the need arose. *See* Tr. 103 (Rodriguez
testifying that plaintiffs did not partake in a dinner meal at the restaurant), 287 (Rodrigues not

---

[16] Gonzalez did not receive this break because his shift began at 5 p.m.

attesting to dinner meal, despite attesting to a midday meal, belied that these meals were 30–40 minutes long and occurred on a regular basis).

## VII.    Meals

The Court finds that the restaurant made food available for plaintiffs to eat for lunch and dinner while working there.  Tr. 102–03 (Rodriguez acknowledging that food was available for lunch and dinner), 123 (Romero same), 161 (Rosales acknowledging that lunch was provided every day, and sometimes dinner); Rodrigues Aff. ¶ 11 (attesting that plaintiffs ate the restaurant's family meals, but that defendants did not take a meal credit against plaintiffs' wages); Leo Decl. ¶ 10 (same); Chaouhan Aff. ¶ 11 (same); Ndiaye Aff. ¶ 11 (delivery workers regularly ate family meals).  However, the Court finds, plaintiffs did not always avail themselves of the food the restaurant made available; plaintiffs sometimes did not participate in the lunch meal, and more frequently did not participate in the dinner meal, including because of the need to work at that time.  *See* Tr. 102–03 (Rodriguez stating that lunch would occasionally be interrupted by the need to make deliveries, and saying that they generally did not have the dinner meal), 161 (Rosales stating that workers were sometimes provided dinner).  During the meals, plaintiffs were allowed to eat chicken tikka marsala but not goat, lamb, fish, or shrimp.  Tr. 123 (Romero).  No evidence was submitted as to the costs incurred by defendants in providing these meals; the dates plaintiffs ate, or did not eat, the meals; or the full range of food items made available to plaintiffs for consumption.

## VIII.   Tools of the Trade

The Court finds that the delivery workers were required by defendants to use or purchase bicycles, and related equipment, to make their deliveries.

The delivery workers utilized bicycles in order to make their deliveries.  Tr. 363–64 (Leo testified that all delivery workers used bicycles).  Spice Symphony's delivery territory covered

approximately one mile north and south of the restaurant, and half a mile east and west of the restaurant. *Id.* (testifying the area covered 14th street to 57th street, and from the FDR Drive to Sixth Avenue); *see also* Tr. 91 (Rodriguez same, except that it also extended to Seventh Avenue).

Plaintiffs declared that they were "required to purchase" bicycles and various supporting equipment (such as lights, helmets, vests, brakes, and tire replacements, as well as a whistle and a raincoat) for their work. Gonzalez Decl. ¶ 24; Rodriguez Decl. ¶ 27; Hernandez Decl. ¶ 29; Marco Decl. ¶ 33; *see also* Tr. 363–64 (Leo testifying that delivery workers had their own bicycles which they used to perform their duties). Although no plaintiff testified that he was told directly by any of the defendants that they were required to use a bicycle, Rodriguez testified that he was told that he needed to use a bicycle by Romero, who supervised the delivery workers. Tr. 92–94. Romero confirmed that he informed the delivery workers that they needed to use bicycles, and further explained that he gave this instruction at Chaouhan's behest. Tr. 124–25 (Romero). He also explained, as context, that the need for bicycles was evident by Chaouhan's frequently calling delivery workers on their cell phones to find out their locations and status with respect to deliveries. *See id.*

Defendants deny that the delivery workers were required to use bicycles. Leo testified that he never indicated in interviews that would-be delivery workers were required to purchase or have bicycles, but rather, that it was up to the delivery workers whether to ride bicycles or, perhaps, walk to make their deliveries. Tr. 363; *see also* Rodrigues Aff. ¶ 19 (attesting that delivery workers were not required to purchase tools of the trade); Leo Decl. ¶ 18 (same); Chaouhan Aff. ¶ 19 (same); Ndiaye Aff. ¶ 10 (same). However, Leo acknowledged, in response to the Court's questioning, that using a bicycle was realistically necessary to perform delivery

34

duties with efficiency given the size of the restaurant's delivery territory.  Tr. 364.  He also acknowledged that, although he never asked any of the delivery workers in their hiring interviews whether they possessed a bicycle, he already knew that they possessed bicycles because they arrived at the restaurant with their bicycles, and that he had never hired a delivery worker who did not use a bicycle.  Tr. 363–64.

The Court finds that the plaintiff delivery workers were required to use bicycles to perform their delivery duties, and that they used and/or purchased their own bicycles and related equipment to perform these duties.  The Court credits Romero's testimony that he conveyed the requirement of using bicycles to the delivery workers as a result of instructions he received from Chaouhan.  The size of the delivery territory, and the need for the delivery workers to make prompt deliveries (as evidenced by Chaouhan's frequent calls to delivery workers regarding their delivery status), made using bicycles an essential component of the delivery workers' duties.  While it was certainly also in the delivery workers' interests that the deliveries be made as quickly as possible—because more deliveries resulted in more tips for the delivery workers—the Court does not credit defendants' testimony that the delivery workers could have maintained their employment by making only as many deliveries as could be made by foot.

Although no documentary evidence was introduced, the Court credits plaintiffs' declarations regarding the expenses they incurred in the purchase and maintenance of their bicycles and related equipment.  Specifically, plaintiffs attested to the following expenses:

- Gonzalez: one bicycle for $600; two helmets for $45 each ($90); three vests for $25 each ($75); four lights for $15 each ($60); eight wheel replacements for $15 each ($120); two brakes for $15 each ($30).  Gonzalez Decl. ¶ 24.

- Hernandez: two bicycles for $300 and $200 respectively; one helmet for $35. Hernandez Decl. ¶ 29.

- Rodriguez: one bicycle for $250; one helmet for $35; two vests for $15 each ($30); two brakes for $35 each ($70); two lights for $30 each ($60); one whistle for $25; one raincoat for $60. Rodriguez Decl. ¶ 27.

- Marco: one bicycle (for an amount not specified); one vest for $20; one helmet for $40; and bicycle lights for $80. Macro Decl. ¶ 33.

## IX.   Defendants' Willfulness and Good Faith

Here, the Court makes findings of fact with respect to defendants' willfulness with respect to their violations of the FLSA, and good faith compliance with the FLSA and NYLL.

The Court does not find that defendants knew that they were violating the FLSA, or that they consciously disregarded the risk that they were doing so. Plaintiffs provided no evidence bearing on defendants' state of mind with respect to the legality of the restaurant's pay practices. To be sure, defendants' wholesale failure to maintain records of the hours worked by plaintiffs may be argued to indicate reckless disregard of their legal obligations with respect to employee pay. And the Court is quite troubled by defendants' trial conduct—specifically, their submission of a Pay Journal doctored to falsely indicate that plaintiffs had worked fewer hours than they actually did, and that plaintiffs had agreed to sub-minimum-wage hourly rates ($6 for regular hours; $9 for overtime) on account of a tip credit.

Nevertheless, the assembled evidence is more consistent with the conclusion that, during the period at issue, defendants were ignorant and incurious as opposed to willfully non-compliant with federal law. Further, the fact that the delivery workers generally received substantial sums in tips, and that the non-delivery workers (who did not receive tips) received substantially higher

salaries than the delivery workers, suggests that defendants may have, mistakenly, believed that it was sufficient under the law that the total sums plaintiffs received (including via tips) exceeded the minimum wage.  Plaintiffs, notably, did not adduce any evidence that any of the defendants had had prior experiences that would have sensitized them to the obligations of the FLSA.  Such evidence might have supported an inference that defendants' violations of the same laws here were willful.  In the absence of evidence from which more reliable inferences could be drawn as to defendants' disobedient state of mind, the Court finds that the trial evidence does not support that defendants acted willfully.

At the same time, the Court cannot find good faith compliance by defendants.  The trial record was devoid of evidence that defendants undertook any effort to ascertain their obligations under the FLSA and the NYLL.  In opening statements, defense counsel suggested that there would be testimony about conversations with an accountant.  Tr. 14.  But the defense did not offer such testimony (or other evidence).

## X.      Credibility

In addition to the Court's close review of the documentary evidence, the Court paid close attention to the credibility of the trial witnesses.  The Court's judgment is that plaintiffs were, in general, significantly more credible than defendants in their testimony.

Credibility determinations can be of great importance in cases where, as here, there are conflicting accounts as to workplace practices and the authenticity of documents.  In this case, credibility determinations were complicated by language barriers.  All plaintiffs testified in Spanish and their testimony was conveyed to the Court by a translator.  Thus, the Court, as factfinder, lacked direct access to some of the linguistic cues or nuances of expression that can bear on a witness's veracity.  In some instances, answers to questions on cross-examination

questions were non-responsive, in a way that strongly suggested to the Court that the thrust of a question had been, quite literally, lost in translation.

Despite these limitations, some important observations relating to credibility could be made, and the Court was generally able to assess the credibility of the witnesses' claims in their sworn declarations based on the extent to which that testimony withstood cross examination and accorded with other credible evidence.

As to plaintiffs, the most significant area of conflicting testimony concerned the delivery worker plaintiffs' weekly pay. Through the Pay Journal, defense counsel was able to impeach the testimony of the delivery worker plaintiffs to the effect that they had been paid, during either their entire employment or long stretches of it, a fixed and never varying weekly salary. As the Pay Journal revealed, and as Rodriguez, Gonzalez, and Marco acknowledged was accurate, the delivery workers' pay did fluctuate to some degree between different weeks. The Court does not find, however, that this inaccuracy seriously impaired Rodriguez's, Gonzalez's, Hernandez's, or Marco's general credibility. Although their weekly pay did vary to a modest degree, the delivery workers frequently received the weekly pay to which they attested. The Court therefore finds their generalization about their weekly pay to have been just that—a generalization that was broadly accurate, but which lacked precision, perhaps because of language barriers and perhaps because the workers had forgotten that in discrete weeks their pay total had deviated from the norm. Notably, too, defendants did not produce the Pay Journal until the brink of trial, after plaintiffs had submitted their written declarations. Had the opportunity been presented for plaintiffs to refresh their memory by reviewing the weekly pay totals alongside which they signed in the Pay Journal, plaintiffs' recollections in their declarations as to their weekly pay amounts may have been more nuanced.

Similarly, the Court does not find that Romero's testimony that he received a fixed weekly rate of $425—whereas his actual weekly pay was either $400 or $450—damages his credibility. This claim, too, appears to reflect imperfect recollection. It was also substantially accurate, as $425 was the average of the two alternative rates Romero was paid.

Hernandez's live testimony was more problematic. He was confronted with the Pay Journal after other plaintiffs had testified, and had, in fact, acknowledged their signatures in it and that their pay had varied to some degree as opposed to being uniform. Unlike his fellow plaintiffs, Hernandez was evasive and unresponsive to clear questions. Even accounting for the challenges presented by the language barrier and the unfamiliarity of a courtroom setting, the Court is constrained to find his testimony, on the whole, less credible than that of the other plaintiffs.

As to defendants, their testimony was generally incredible as to their claim that plaintiffs had been paid according to pre-set hourly rates of pay. The Court was dismayed by defendants' flailing and unpersuasive attempts to defend the pay-rate and hours-worked data recorded in the Time Sheets and Pay Register—data which the Court has found to have been transparently fabricated and added after-the-fact, to create a prop for use in defending against this lawsuit. Memorably, Rodrigues and Chaouhan were unable even to explain the meaning of the data in the Time Sheets they maintained. This not only undermined those Time Sheets, but more broadly impeached defendants' testimony that they had maintained records of plaintiffs' actual hours worked. Defendants' willingness to stand by doctored records that ludicrously reported that the delivery workers had each worked identical hours, week after week, down to the precise fraction of an hour, despite holding jobs with flexible daily schedules, unavoidably called into question the seriousness with which defendants had approached trial testimony.

Defendants' willingness to create false documentary evidence was also revealed in the copies of checks paid to Rosales.  The memo endorsements on the checks identified him as a part-time employee despite the acknowledged fact that he was not.  Rodrigues was unable to explain that repeated "mistake."  The logical inference was that one or more defendants had included that language to buttress the false claim (contained elsewhere in the memo field) that Rosales, and not Spice Symphony, was solely responsible for paying taxes attributable to his work.

In light of defendants' submission of this fabricated evidence, and their under-oath embrace of it as accurate, the Court is constrained to view with suspicion the balance of defendants' testimony.  The Court forcefully rejects as false defendants' testimony as to plaintiffs' hours worked and purported pay rate, points on which the Court found plaintiffs' testimony far more credible.  In so finding, the Court notes, too, that defendants had an obvious incentive to falsify as to these subjects—to avoid liability and a potentially heavy damages award.[17]

## CONCLUSIONS OF LAW

**XI.  Jurisdiction**

This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and the FLSA, 29 U.S.C. § 216, and supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C. § 1367(a).

---

[17] Plaintiffs too were interested parties, of course, and the Court was mindful of that in assessing their testimony.  However, plaintiffs' testimony (save Hernandez's) did not suffer from any of the shortcomings dogging defendants.  Plaintiffs' testimony was logical, did not entail adopting doctored records, and was broadly consistent with other evidence (including fellow plaintiffs' testimony).  In contrast to defendants' lockstep adoption of the bogus pay records, the modest variations in plaintiffs' testimony were, if anything, a hallmark of credibility, insofar as they suggested that plaintiffs had not coordinated a false story among themselves.  The Court's view is that plaintiffs were genuinely attempting to recall and explain their hours and work conditions.

## XII.   Enterprise Engaged in Interstate Commerce

The FLSA's minimum wage and overtime provisions apply if an employee either "is engaged in commerce or in the production of goods for commerce," or "is employed in an enterprise engaged in commerce or in the production of goods for commerce."  29 U.S.C. § 206(a), 207(a)(1).  "The two categories are commonly referred to as 'individual' and 'enterprise' coverage, respectively."  *Jacobs v. N.Y. Foundling Hosp.*, 577 F.3d 93, 96 (2d Cir. 2009) (per curiam).  An "enterprise engaged in commerce" is an enterprise that (1) "has employees handling, selling, or otherwise working on goods or materials that have moved in or produced for commerce" and (2) "whose annual gross volume of sales made or business done is not less than $500,000."  29 U.S.C. § 203(s)(1).

The Court holds that Spice Symphony was an enterprise engaged in commerce for the purposes of the FLSA for the years 2013 and 2014.  During those years, the restaurant had annual sales exceeding $500,000, and the employees of Spice Symphony regularly used ingredients and other items that had traveled or were produced in interstate commerce.  Joint Stip. of Fact ¶¶ 5–6.

However, based on the trial evidence, the Court holds that plaintiffs have failed to show that the FLSA covered them in the year 2012.  There was no evidence adduced as to Spice Symphony's annual sales volumes in 2012, let alone that its annual sales exceeded $500,000, or that any plaintiff qualified under the individual coverage provision during that year.

## XIII.   Employer Status

The Court holds that Spice Symphony, Chaouhan, Leo, and Rodrigues were all employers subject to the FLSA's and NYLL's requirements during plaintiffs' employment at Spice Symphony.

41

The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Supreme Court has emphasized that this is an expansive definition with "striking breadth." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992). An individual may simultaneously have multiple "employers" for the purposes of the FLSA. *See* 29 C.F.R. § 791.2(a) (if facts demonstrate that the employee is jointly employed by more than one employer, then "all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of [FLSA]"). Each employer is jointly and severally liable for all back wages and liquidated damages. *Moon v. Kwon*, 248 F. Supp. 2d 201, 236–38 (S.D.N.Y. 2002).

"[W]hether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts.'" *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). The determination of whether defendants are plaintiffs' joint employers is to be based on "the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947); *see also Barfield*, 537 F.3d at 141–42 (employment is "to be determined on a case-by-case basis by review of the totality of the circumstances"). "Above and beyond the plain language, moreover, the remedial nature of the statute further warrants an expansive interpretation of its provisions so that they will have 'the widest possible impact in the national economy.'" *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)). "When it comes to 'employer' status under the FLSA, control is key." *Lopez v. Acme Am. Envtl. Co.*, No. 12 Civ. 511 (WHP), 2012 WL 6062501, at *3 (S.D.N.Y. Dec. 6, 2012); *see also RSR*, 172 F.3d at 135 ("[C]ontrol of employees is central to deciding whether appellant should be deemed an employer.").

The Second Circuit has instructed that the "economic reality" test compels courts to consider a range of factors in resolving whether a defendant qualifies as an employer under the FLSA, including "whether the individual: '(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" *Gillian v. Starjem Rest. Corp.*, No. 10 Civ. 6056 (JSR), 2011 WL 4639842, at *4 (S.D.N.Y. Oct. 4, 2011) (citing *Carter*, 735 F.2d at 12). "No one of the four factors standing alone is dispositive. Instead the 'economic reality' test encompasses the totality of circumstances, no one of which is exclusive." *RSR*, 172 F.3d at 139 (internal citation omitted).[18]

The statutory standard for employer status under the NYLL is nearly identical to that of the FLSA. *Compare* 29 U.S.C. § 203(d) ("'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ."), *with* N.Y. Lab. Law § 190(3) ("'Employer' includes any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service."). "Neither the New York Court of Appeals nor the Second Circuit has decided whether the tests for 'employer' status are the same under the FLSA and the NYLL. However, district courts in this Circuit have consistently interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA." *Inclan v. N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 511 (S.D.N.Y. 2015) (citations and internal quotation marks omitted). The parties do not argue otherwise, and the Court is aware of no authority to the contrary. The Court

---

[18] In addition to the formal control test comprising the *Carter* factors, the Second Circuit has also articulated a functional control test comprising other factors, which are less applicable here. *See Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71–72 (2d Cir. 2003); *Barfield v. N.Y.C. Health & Hosp. Corp.*, 432 F. Supp. 2d 390, 392–93 (S.D.N.Y. 2006), *aff'd*, 537 F.3d 132 (2d Cir. 2008).

therefore follows the weight of authority among district courts in this Circuit and applies the economic reality analysis to both statutes. *See Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 940 (S.D.N.Y. 2013).

Here, the parties stipulated that all plaintiffs were employees of Spice Symphony. Joint Stip. of Fact ¶ 2. The Court holds that Chaouhan, Leo, and Rodrigues also were plaintiffs' employers.[19] All three were managers at Spice Symphony during the time plaintiffs were employed there. And, as to the *RSR* factors, at least Leo and Chaouhan had the power to hire employees; all three were involved in determining the rate and method of payment for plaintiffs; Leo and Chaouhan supervised and controlled the employees' work schedules and conditions of employment; Rodrigues maintained the restaurant's employment records during the relevant period; and all three were involved in paying plaintiffs their wages—Leo and Chaouhan generally paid the delivery workers their tips, and Rodrigues paid all employees their weekly wages. Thus, the Court holds that the totality of the circumstances supports the conclusion that all three individual defendants were plaintiffs' joint employers along with the corporate entity itself.

## XIV.   Minimum and Overtime Wages

Both the FLSA and NYLL provide that an employee must be paid a minimum wage. 29 U.S.C. § 206; N.Y. Lab. Law § 652. The minimum wage rate under the FLSA was $7.25 per hour during plaintiffs' employment at Spice Symphony. Dkt. 47 ("Joint Stip. of Law") ¶ 1 (citing 29 U.S.C. § 206(a)). The minimum wage rate under the NYLL varied during the period relevant here: From January 1, 2011 through December 30, 2013, the minimum wage rate was

---

[19] Defendants' brief did not address whether each of the individual defendants qualified as joint employers.

$7.25 per hour; and from December 31, 2013 through December 30, 2014, it was $8.00 per hour. *Id.* ¶ 2 (citing N.Y. Lab. Law § 652; 12 N.Y.C.R.R. § 146-1.2(a)).

Both the FLSA and NYLL also provide that for each hour an employee works in excess of 40 hours in a given work week, the employee must be paid at the rate of one and one-half times the employee's regular hourly rate. Joint Stip. of Law ¶ 6 (citing 29 U.S.C. § 207; 12 N.Y.C.R.R. § 146-1.4). Under the FLSA, overtime pay is calculated using a multiplier of one and one-half to an employee's "regular rate" of pay. Joint Stip. of Law ¶ 7 (citing 29 U.S.C. § 207(a)(1); 29 C.F.R. § 778.107).

To determine whether defendants violated the FLSA's and NYLL's minimum wage and overtime provisions, the Court must first address (1) whether defendants are entitled to take a tip credit against their minimum wage and overtime obligations for tips received by the delivery workers; (2) whether defendants are entitled to take a meal credit for food provided by the restaurant to plaintiffs for meals; and (3) whether plaintiffs, during their workdays, took qualified breaks that do not qualify as work time and therefore are not compensable time under the statutes. Once these potential credits and deductions are resolved, the Court then applies the pertinent minimum wage and overtime law to the facts.

### A. Tip Credit

#### 1. FLSA

Under the FLSA, "an employer [may] pay a tipped [employee] a cash wage that is lower than the statutory minimum wage, provided that[, *inter alia*,] the cash wage and the employee's tips, taken together, are at least equivalent to the minimum wage." *Inclan*, 95 F. Supp. 3d at 497

45

(citing 29 U.S.C. §§ 203(m)).[20]  "This allowance is known as a 'tip credit.'"  *Salinas v. Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 465 (S.D.N.Y. 2015).

The FLSA provides that the tip credit "shall not apply with respect to any tipped employee unless [1] such employee has been informed by the employer of the [statute's tip credit] provisions, and [2] all tips received by such employee have been retained by the employee."  29 U.S.C. § 203(m).  The "tip credit" provision is "strictly construed," and "an employer may not take a tip credit unless it complies strictly with *both* statutory requirements."  *Chan v. Sung Yue Tung Corp.*, No. 03 Civ. 6048 (GEL), 2007 WL 313483, at *17 (S.D.N.Y. Feb. 1, 2007), *abrogated on other grounds by Barenboim v. Starbucks Corp.*, 698 F.3d 104 (2d Cir. 2012).

Courts in and outside of this District "have interpreted the notice provision to require 'at the very least notice to employees of the employer's intention to treat tips as satisfying part of the employer's minimum wage obligations.'"  *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 287 (S.D.N.Y. 2011) (quoting *Martin v. Tango's Rest., Inc.*, 969 F.2d 1319, 1322–23 (1st Cir. 1992); citing also *Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 298 (6th Cir. 1998) ("[A]n employer must inform the employee that it intends to treat tips as satisfying part of the employer's minimum wage obligation."); *Reich v. Chez Robert, Inc.*, 28 F.3d 401, 404 (3d Cir. 1994) ("Section 3(m) . . . allows an employer to reduce a tipped employee's wage below the statutory minimum by an amount to be made up in tips, but only if the employer informs the tipped employee that her wage is being decreased under section 3(m)'s

---

[20] The FLSA defines a tipped employee as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips."  29 U.S.C. § 203(t). Plaintiffs do not dispute that the delivery workers qualified as tipped employees.

tip-credit provision.")).  An employer gives sufficient notice if, for example, it "give[s] employees a copy of § 203(m) and inform[s] them that their tips will be used as a credit against the minimum wage as permitted by law."  *Chan v. Triple 8 Palace, Inc.*, No. 03 Civ. 6048 (GEL), 2006 WL 851749, at *19 (S.D.N.Y. Mar. 30, 2006) (citing *Kilgore*, 160 F.3d at 298–300), *superseded by regulation on other grounds*.  "Employers do not have to 'explain' the tip credit to employees, however; it is enough to 'inform' them of it."  *Id.* (quoting *Kilgore*, 160 F.3d at 298).  The FLSA's notice provision does not require that the notice be given in writing. *See* 29 U.S.C. § 203(m); *Copantitla*, 788 F. Supp. 2d at 288 (evaluating substance of oral statements made to employees).

The FLSA's notice requirement "must be satisfied even if the employee received tips at least equivalent to the minimum wage."  *Chung v. New Silver Palace Rest.*, 246 F. Supp. 2d 220, 229 (S.D.N.Y. 2002).  The employer bears the burden of demonstrating compliance with the FLSA's notice requirement.  *He v. Home on 8th Corp.*, No. 09 Civ. 5630 (GBD), 2014 WL 3974670, at *5 (S.D.N.Y. Aug. 13, 2014).  "If the employer cannot show that it has informed employees that tips are being credited against their wages, then no tip credit can be taken and the employer is liable for the full minimum-wage."  *Inclan*, 95 F. Supp. 3d at 497 (quoting *Chez Robert*, 28 F.3d at 403) (internal quotation marks omitted).

Defendants here satisfied the first requirement of the tip credit, as plaintiffs concede that the delivery workers retained all of their tips.  However, defendants have not complied with the notice provision under the FLSA and therefore cannot avail themselves of a tip credit to satisfy their minimum wage obligations to the delivery workers.[21]  As the Court has explained, *supra*

---

[21] Although defendants' brief cites twice to testimony that Romero received $20–$30 in tips per month, defendants nowhere contend that he was informed that his tips would be used to offset

section V, the delivery workers, upon their hiring, were informed that they would be paid a fixed

weekly wage[22] and tips, but Spice Symphony never informed the employees that it intended to

use the tips the workers received to satisfy any part of its minimum wage obligations.  Moreover,

the Court found, Spice Symphony did not maintain, in English and Spanish, posters from the

Department of Labor containing information about the provisions of the FLSA.  And, even had a

DOL poster been prominently displayed in the workplace, Spice Symphony's notification to the

delivery workers merely that they would earn certain wages plus tips, without more, would not

satisfy the FLSA's notice provision for taking a tip credit.  *See Copantitla*, 788 F. Supp. at 287–

88 (holding employer had not satisfied notice provision under similar facts); *see also Salinas*,

123 F. Supp. 3d at 461, 465–67 (crediting, over employer's contrary attestation, employees'

declarations that they were not told when hired that they would be paid at a below minimum

wage rate because they would be receiving tips, and therefore finding the notice provision

unsatisfied).[23]

Simply put, Spice Symphony failed entirely to notify the workers that their statutory

minimum-wage entitlement would be met, in part, by the payment of tips.  This case is thus

distinct from *Garcia v. Koning Rests. Int'l, L.C.*, No. 12 Civ. 23629, 2013 WL 8150984 (S.D.

Fla. May 10, 2013), on which defendants rely.  There, as the plaintiff worker himself

acknowledged, the employer had informed its delivery workers at an in-store meeting that it

---

defendants' minimum and overtime wage obligations.  Defendants therefore also cannot avail
themselves of a tip credit as to Romero.

[22] For Gonzalez, a fixed daily wage.

[23] Even if the Court had credited defendants' testimony that the Pay Journal the delivery workers
signed when they collected their pay had indicated the wage rates that defendants claimed it was
paying the delivery workers of $6 per hour (and $9 per hour for overtime), these notations would
still have failed to provide the notice necessary to support a tip credit, because they did not
indicate that the tips were being used to satisfy Spice Symphony's statutory wage obligations.

would pay them "a reduced cash wage of $5.00 an hour [compared to their previous, minimum wage of $7.25 an hour] and that the rest of their minimum wage would be made up in tips"; the employer thereby satisfied the notice requirement. *Id.* at *2, *5, *7. Unlike in *Garcia*, plaintiffs here were never told that their wages would be *reduced* below the minimum wage on account of tips received.

Defendants ask the Court to follow district courts from outside the District that have held that a verbal notice to an employee that they would be paid a certain wage plus tips, combined with a prominently displayed DOL poster in a language the employee can read, is sufficient notice. *See* Def. Br. 25 (citing *Pellon v. Bus. Representation Int'l, Inc.*, 528 F. Supp. 2d 1306, 1310–11 (S.D. Fla. 2007); *Ide v. Neighborhood Rest. Partners, LLC*, 32 F. Supp. 3d 1285, 1292–93 (N.D. Ga. 2014)). Factually, however, those cases are inapposite, because the Court has not credited defendants' uncorroborated claim that the posters were prominently displayed during plaintiffs' employment. But even had the poster been displayed, the Court would decline to permit a tip credit under the FLSA, for two reasons.

First, as several courts of appeals have held, the notice requirement for the FLSA tip credit requires the employer to notify "employees of the employer's intention to treat tips as satisfying part of the employer's minimum wage obligations," or that the employee's wages were "being decreased" under the tip credit provision, and merely telling an employee that he will earn certain wages plus tips does not supply such notice. *See Copantitla*, 788 F. Supp. at 287–88 (citing the standards articulated by the First, Third, and Sixth Circuits). As various courts in this District have held, a DOL poster does not cure this deficiency where the employer has not made its intentions plain to employees. *Id.* at 289 ("A generic government poster could inform employees that minimum wage obligations exist, but could not possibly inform employees that

their employers intend to take the tip credit with respect to their salary.") (declining to follow *Pellon*); *see also Salinas*, 123 F. Supp. 3d at 467 (generic government poster not sufficient to satisfy notice requirement, citing *Copantitla*); *cf. Perez v. G & P Auto Wash Inc.*, 930 F. Supp. 2d 423, 435 (E.D.N.Y. 2013) (genuine issue of fact existed as to whether poster contained information specific to employer's tip credit practice in addition to relevant federal and state labor laws, and therefore may have been sufficient to satisfy notice requirement).

Second, courts in this district have construed § 203(m)'s requirements more demandingly than the out-of-district cases on which defendants rely.  *See, e.g.*, *Chung*, 246 F. Supp. 2d at 229; *Salinas*, 123 F. Supp. 3d at 465; *Copantitla*, 788 F. Supp. 2d at 287, 289.  This Court joins those courts in strictly construing the FLSA's exemptions.  Indeed, *Pellon*, on which defendants relied, acknowledged that "[e]xemptions are to be construed strictly against employers," but stated that it was unable to follow the district court cases so holding as to § 203(m), viewing them as inconsistent with Eleventh Circuit precedent that applied "ordinary meaning analysis" to construe a similar provision of the FLSA.  528 F. Supp. 2d at 1310; *see also Ide*, 32 F. Supp. 3d at 1292–93 (relying on *Pellon*).

For these independent reasons, Spice Symphony may not utilize a tip credit so as to reduce the minimum wage and overtime wages it was obliged to pay its delivery workers under the FLSA.

### 2.      NYLL

The NYLL allows an employer to take a tip credit for tipped employees, subject to certain conditions similar to those under the FLSA.  "An employer may take a credit towards the basic minimum hourly rate if a service employee or food service worker receives enough tips and if the employee has been notified of the tip credit as required in section 146-2.2 of this Part. Such employees shall be considered 'tipped employees.'"  12 N.Y.C.R.R. § 146-1.3.  Notice of

the tip credit under the NYLL, however, must be written: "Prior to the start of employment, an employer shall give each employee written notice of the employee's regular hourly pay rate, overtime hourly pay rate, the amount of tip credit, if any, to be taken from the basic minimum hourly rate, and the regular payday." *Id.* § 146-2.2(a). These notices must be provided in English and the workers' primary language, and acknowledgement of receipt of such notices, signed by the employee, are required to be kept for six years. *Id.* § 146-2.2 (a) & (c). An employer that fails to comply with the notice requirements under the NYLL may not utilize the tip credit to satisfy its minimum wage and overtime obligations. *See Salinas*, 132 F. Supp. 3d at 467; *Inclan*, 95 F. Supp. 3d at 498.

The written records maintained by defendants here fall far short of meeting these obligations. Defendants do not contend that they ever provided the delivery workers with a written notice of their "regular hourly pay rate, overtime hourly pay rate, [and] the amount of tip credit, if any, to be taken from the basic minimum hourly rate" as required by § 146-2.2. *See, e.g.*, *Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 454–55 (S.D.N.Y. 2014) (defendant could not utilize tip credit under NYLL due to failure to provide written wage notice). While the delivery workers signed daily their tip receipts showing their tip income, and signed weekly the Pay Journal showing their non-tip income, these documents nowhere recite the amount of tip credit being taken to satisfy the minimum wage and overtime wage laws. Further, even if the Court had credited defendants' claim to have maintained DOL posters in the restaurant, defendants' notion that the delivery workers could have inferred that the restaurant was taking a tip credit and calculated the amount of this credit for themselves is plainly at odds with the NYLL's notice requirement.

Therefore, Spice Symphony may not utilize a tip credit for the purposes of complying with its obligations under the NYLL, either.[24]

### B.    Meal Credit

Defendants also propose to apply a credit against plaintiffs' wages for meals defendants provided plaintiffs at work.  Def. Br. 24.  The Court holds that defendants may not do so, under either the FLSA or NYLL.

Under the FLSA, an employee's wage "includes the reasonable cost . . . to the employer of furnishing such employee with board . . . if such board . . . [is] customarily furnished by such employer to his employees."  29 U.S.C. § 203(m).  However, the meal credit's "reasonable cost" may "not [be] more than the actual cost," 29 C.F.R. § 531.3(a), and "the employer must retain records documenting the out-of-pocket costs that it incurred," *Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 256–57 (S.D.N.Y. 2008) (citing 29 C.F.R. § 516.27(a)).  The employer "bears the burden of proving both the actual costs and their reasonableness."  *Id.*; *see also Nicholson v. Twelfth St. Corp.*, No. 09 Civ. 1984 (HB), 2010 WL 1780957, at *3 (S.D.N.Y. May 4, 2010) ("By law, an employer may claim a meal credit if it is properly documented.").  In addition, under the FLSA, meal credits can only be used to offset an employer's minimum wage, and not overtime pay, obligations.  *Moon*, 248 F. Supp. 2d at 232–33.

Defendants have not met their burden of proof as to this issue.  Defendants have not come forward with any evidence as to the costs incurred in providing plaintiffs with meals, or the extent to which plaintiffs actually availed themselves of the meals offered by defendants.  Nor have they even claimed to have maintained the requisite records.  *Cf. Archie v. Grand Cent.*

---

[24] In light of this ruling, the Court has no occasion to address plaintiffs' alternative argument that plaintiffs' performance of significant non-delivery work independently barred—in whole or in part—Spice Symphony from taking a tip credit.  *See* Pl. Br. 17–18.

*P'ship, Inc.*, 86 F. Supp. 2d 262, 269 (S.D.N.Y. 2000) (determining costs by averaging the costs for food and supplies paid for by defendants, and dividing it by the total number of meals served, as evidenced by employee sign-in sheets for meals).[25]  And plaintiffs' testimony does not fill this void.  Plaintiffs testified that they often did not eat the food provided by defendants.

Nor may defendants utilize the meal credit to relieve themselves of NYLL obligations. "Meals . . . provided by an employer to an employee may be considered part of the wages paid to the employee but shall be valued at no more than . . . $2.50 per meal."  12 N.Y.C.R.R. § 146-1.9. To qualify as a meal, however, the employer "shall provide adequate portions of a variety of wholesome, nutritious foods and shall include at least one of the types of food from all four of the following groups: (1) fruits or vegetables; (2) grains or potatoes; (3) eggs, meat, fish, poultry, dairy, or legumes; and (4) tea, coffee, milk or juice."  *Id.* § 146-3.7; *see also Guan Ming Lin v. Benihana Nat. Corp.*, 275 F.R.D. 165, 171 (S.D.N.Y. 2011) (finding employer must satisfy § 146-3.7's requirements to utilize meal credit).

On the evidence presented at trial, defendants failed to satisfy these requirements. Defendants have not supplied any proof that the food that they gave plaintiffs qualified as "meals" by containing "adequate portions" of food from all four categories identified in the regulations.  And the definition of meal contains mandatory language, 12 N.Y.C.R.R. § 146-3.7

---

[25] Defendants' reliance on *Archie* for the proposition that "meals are 'presumed to be part of wages under the statute,'" Def. Br. 24 (quoting *Archie*, 86 F. Supp. 2d at 268), is misplaced to the extent defendants suggest it excuses them from offering proof as to the costs of the meals provided.  The quoted language in *Archie* derived from the Second Circuit's decision in *Soler v. G. & U., Inc.*, 833 F. 2d 1104, 1109 (2d Cir. 1987), which noted that meals are presumptively eligible to be considered as wages, unlike other "facilities" an employer provides, as to which a case-by-case analysis is required to determine whether those facilities were intended to benefit the employee or the employer.  Neither *Archie* nor *Soler* supports excusing defendants from the requirement to prove the fact that meals were provided or the cost of such meals.

("shall provide" and "shall include"), indicating that failure to provide meals that meet the above standards bars a defendant from taking meal credit against the wages owed to its employees.[26]

### C.     Meal Breaks

Under both the FLSA and NYLL, "all of the time worked during a continuous workday is compensable, save for bona fide meal breaks." *Hart*, 60 F. Supp. 3d at 475 n.15; *see* 29 C.F.R. § 785.19(a) ("Bona fide meal periods are not worktime."). For a break to so qualify, the employee "must be completely relieved from duty for the purposes of eating regular meals." *Id.* "Ordinarily 30 minutes or more is long enough for a bona fide meal period," *id.*, but "[r]est periods of short duration, running from 5 minutes to about 20 minutes . . . are customarily paid for as working time [and] must be counted as hours worked," 29 C.F.R. § 785.18. "It is not necessary that an employee be permitted to leave the premises if he is otherwise completely freed from duties during the meal period." 29 C.F.R. § 785.19(b). Similarly, the NYLL provides that "[w]orking time means . . . time an employee is required to be available for work at a place . . . prescribed by the employer such that the employee is unable to use the time productively for his or her own purpose." 12 N.Y.C.R.R. § 146-3.6.

---

[26] A separate bar may apply:  At least one court in this District has also held that an employer may not utilize the meal credit unless it also complies with the NYLL's recordkeeping requirements. *See Guan Ming Lin*, 275 F.R.D. at 171 ("As a prerequisite to taking a meal credit, the employer must state on the employee's pay stub the amount of the meal credit." (citing 12 N.Y.C.R.R. § 146–2.3)); *see also Padilla v. Manlapaz*, 643 F. Supp. 2d 302, 309–10 (E.D.N.Y. 2009) (employer not permitted to take tip or meal credit for failure to comply with recordkeeping requirements under previous versions of regulations, since repealed).  That said, the Court notes that the meal credit regulation's language does not expressly require such notice, by pay stub or otherwise, as a condition of taking the credit.  *Compare* 12 N.Y.C.R.R. § 146-1.9 (meal credit "may be considered part of the wages"), *with* 12 N.Y.C.R.R. § 146-1.3 (tip credit may be taken "*if the employee has been notified* of the tip credit as required in section 146-2.2 of this Part" (emphasis added)).  If such notice were required, that would independently bar use of the meal credit here, because defendants did not provide plaintiffs with pay stubs at all, let alone ones that "list . . . credits claimed (for tips, meals and lodging)." 12 N.Y.C.R.R. § 146-2.3.

The Court has found that Hernandez, Marco, Rodriguez, and Romero were generally given a midday break of 60 minutes each day and that Rosales was generally given a 45-minute break each day between 3 p.m. and 5 p.m. during which they were able to use the time for their own purposes.  Therefore, the Court holds defendants were not required to compensate them for that time.  *See* Pl. Br. 8 (conceding that if plaintiffs received a bona fide break, such time should be excluded from plaintiffs' working time).

### D.     Minimum and Overtime Wage Violations

The Court holds that defendants violated the FLSA's and NYLL's minimum wage and overtime provisions as to all plaintiffs.  An employee seeking to recover underpayment of wages "has the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).  However, where an employer fails to maintain adequate records of the employee's hours worked, wages earned, and other terms and conditions of employment, the employee is found to satisfy this burden if he or she can prove that the employee "in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.*; *see also Moon*, 248 F. Supp. 2d at 219 (citing *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 66 (2d Cir. 1997)).  This burden is "not high" and may be met "through estimates based on [the employee's] own recollection." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011).  "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687–88.  "If the employer fails to [do so], the court may then award damages to the employee, even though the result be only approximate." *Id.* at 688.

Here, the Court has found that defendants did not maintain accurate records of plaintiffs' hours worked. And the Court holds that plaintiffs have met their burden, including by "just and reasonable inference," of proving their hours worked (but not properly compensated by defendants), through their declarations and live testimony as to their recollections of their hours worked. The Court's findings regarding the general hours worked by plaintiffs incorporate the Court's overall assessment of all evidence bearing on this point, testimonial and documentary.

Defendants paid the plaintiff delivery workers a fixed weekly salary[27] that, based on the hours the Court has found the plaintiff delivery workers worked, amounts to a sub-minimum wage, for which defendants are not entitled to claim credit for tips earned by the delivery workers or food provided to them by defendants. And, as to the non-delivery workers, defendants paid Romero and Rosales fixed weekly salaries that did not compensate them for their hours worked in excess of 40 hours per week at the overtime wage rate as required by the statutes.

## XV.  Spread of Hours

The NYLL entitles an employee to spread-of-hours pay, meaning "one additional hour of pay at the basic minimum hourly rate" for "each day on which the spread of hours exceeds 10." 12 N.Y.C.R.R. § 146-1.6(a).[28] The "spread of hours" refers to "the length of the interval between the beginning and end of an employee's workday[, and] . . . includes working time plus time off for meals plus intervals off duty." *Id.* § 146-1.6. "[A]ll employees in restaurants, regardless of a given employee's regular rate of pay," are covered by the spread-of-hours requirements." *Id.* at § 146-1.6(d). In other words, employers must "pay [restaurant workers] an

---

[27] For Gonzalez, a fixed daily salary.

[28] Defendants' brief recites the substantive requirements of the New York spread-of-hours provisions, but incorrectly cites to 12 N.Y.C.R.R. § 142-2.4(a). Section 142 covers "Miscellaneous Industries and Occupations"; § 146 covers workers in the hospitality industry.

extra hour's pay at the regular minimum wage for each day they work more than ten hours." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 241 (2d Cir. 2011) (citing the previous version of the regulations).

The Court finds that defendants are liable for unpaid spread-of-hours pay as to all plaintiffs except for Gonzalez. As the Court has found, all plaintiffs except for Gonzalez regularly worked shifts whose spread of hours exceeded 10 hours each day. *See supra* section VI.A.

Defendants concede some degree of liability for their failure to pay plaintiffs spread-of-hours wages, but propose to limit the days implicated, based on their time records. "[O]n days where the Plaintiffs did not spend more than a total of 10 hours at the restaurant, including breaks, they were not entitled to an additional spread of hours pay. As is evidenced by Defendants' time records, however, there were days where Plaintiffs' daily shifts exceeded 10 hours, including breaks, and accordingly, an additional spread of hours pay was required on that day." Def. Br. 24–25. Defendants' proposed damages calculations thus would award plaintiffs spread-of-hours pay for only some weeks worked.

There are three problems with defendants' attempt to use their time records to limit their liability for failing to pay spread-of-hours wages. First, defendants' time records do not cover the full range of time that certain plaintiffs worked for defendants. Second, the Court has found these time records unreliable. And third, even if they were reliable, the time records do not actually identify the "spread-of-hours," that is, the length of time between the beginning and end of plaintiffs' workdays, but rather only purport to show total number of hours worked. The time records thus shed no light on the spread-of-hours claim.

Therefore, because the Court has found that all plaintiffs except Gonzalez regularly worked a day that spanned more than 10 hours, the Court finds that defendants are liable for spread-of-hours pay for each day that these plaintiffs worked, over the full time period that the Court has found that each plaintiff worked.  Of course, to the extent that the Pay Journal can be used to identify weeks in which plaintiffs worked fewer than their normal number of days per week, *see* Pl. Br. 9 n.3; *supra* note 14 (Gonzalez), defendants are not liable for spread-of-hours pay with respect to days when a plaintiff did not work.  *See infra* note 30.

## XVI.   Wage Notices and Statements

"Since April 9, 2011, the NYLL has required that, at the time of hiring, [and annually through December 28, 2014,] employers provide their employees a written notice with the following information: (1) the rate or rates of pay and basis thereof; (2) allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; (3) the regular pay day designated by the employer; (4) the employer's name; (5) any 'doing business as' names used by the employer; (6) the physical address of the employer's main office or principal place of business, and a mailing address if different; (7) the employer's telephone number; and (8) such other information as the commissioner deems material and necessary."  *Salinas*, 123 F. Supp. 3d at 474 (citing N.Y. Lab. Law § 195(1)(a)) (footnotes omitted).  For non-exempt employees, the notice must state the employee's regular hourly rate and overtime rate of pay. N.Y. Lab. Law § 195(1)(a).  The employer is required to obtain from its employees a signed and dated written acknowledgment of receipt of such notice, in English and in the employee's primary language, each time the notice is given, and must maintain these receipts for six years. *Id.*  An employee who does not receive a wage notice within 10 business days of his first day of employment is entitled to recover $50 for each week of work that the violations occurred, up to a maximum of $2,500.  N.Y. Lab. Law § 198(1-b) (eff. Apr. 9, 2011 to Feb. 27, 2015); *Perez v.*

*Platinum Plaza 400 Cleaners, Inc.*, No. 12 Civ. 9353 (PAC), 2015 WL 1881080, at *4 (S.D.N.Y. Apr. 24, 2015) (citing 2014 N.Y. Sess. Laws Ch. 537 (A.8106–C) (McKinney's), amending N.Y. Lab. Law § 198(1–b) to allow for $50 per day with a cap of $5,000).

The Court finds that defendants violated the NYLL's wage notice provision. As found *supra* section V.C, defendants did not provide written notice to plaintiffs as to their rate of pay and the allowances claimed by the employer. For reasons already stated, the Court does not credit defendants' testimony that the Pay Journal contained notations indicating plaintiffs' rates of pay, or that such notations, even if genuine, would have provided the legally required notice. The Court finds that defendants violated the wage notice requirement for the entire duration of each plaintiff's employment at Spice Symphony.

"Since April 9, 2011, the NYLL has also required that employers 'furnish each employee with a statement with every payment of wages, listing the following' information: (1) the dates of work covered by that payment of wages; (2) the employee's name; (3) the employer's name, address, and telephone number; (4) the rate or rates of pay and basis thereof; (5) gross wages; (6) deductions; (7) allowances, if any, claimed as part of the minimum wage; and (8) net wages." *Salinas*, 123 F. Supp. 3d at 475 (citing N.Y. Lab. Law § 195(3)) (footnote omitted). For non-exempt employees, the statement must include "the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked." N.Y. Lab. Law § 195(3). "Prior to February [27], 2015, the failure to do so was a violation for which plaintiffs could receive $100 per work week in damages, with a cap of $2500." *Perez*, 2015 WL 1881080, at *4 (citing 2014 N.Y. Sess. Laws Ch. 537 (A, 8106–C) (McKinney's), amending N.Y. Lab. Law § 198(1–d) to allow for $50 in damages per day with a cap of $5,000).

59

The Court finds that defendants violated the NYLL's wage statement provision, too. As found *supra* section V.D, defendants did not provide wage statements to plaintiffs along with their regular pay. The Court finds that defendants violated the wage statement requirement for the entire duration of each plaintiff's employment at Spice Symphony.

## XVII.  Tools of the Trade

The Court finds that defendants further violated the FLSA and NYLL insofar as the plaintiff delivery workers were required to purchase and/or use bicycles and related equipment. "An employer violates the FLSA if it requires an employee to purchase 'tools of the trade which will be used in or are specifically required for the performance of the employer's particular work' and 'the cost of such tools [purchased by the employee] cuts into the minimum or overtime wages required to be paid to [the employee]." *Salinas*, 123 F. Supp. 3d at 476 (quoting 29 C.F.R. § 531.35). The same is true under New York law. *Id.* (citing 12 N.Y.C.R.R. § 146–2.7(c) ("If an employee must spend money to carry out duties assigned by his or her employer, those expenses must not bring the employee's wage below the required minimum wage.")).

Here, the Court has found that the plaintiff delivery workers were required by Spice Symphony to use bicycles and related equipment. *See supra* section VIII. Other courts in this District have found that bicycles qualify as tools of the trade under the FLSA for delivery workers, such that delivery workers' expenses related to the purchase and maintenance of bicycles formed part of their damages under factual circumstances similar to those here. *See Ke*, 595 F. Supp. 2d at 257–58 ("The primary role of these [delivery workers] was to deliver hot meals to hungry and often impatient customers over a large geographic expanse . . . . Absent bicycles or motorbikes, it would have been impossible for the deliverymen to carry out their job in a manner that satisfied the business needs of the restaurant."); *see also Cao v. Wu Liang Ye Lexington Rest., Inc.*, No. 08 Civ. 3725 (DC), 2010 WL 4159391, at *4–5 (S.D.N.Y. Sept. 30,

2010) ("Plaintiffs have established that the plaintiff delivery workers were required to purchase bicycles, which were used and specifically required for their delivery work. Because plaintiffs were not reimbursed for the costs of the bicycles and the necessary repairs, and because they were paid below minimum wage, they are entitled to recover damages for those amounts.").

The evidence in this case—both direct evidence that Chaouhan instructed Romero to convey the bicycle requirement to the delivery workers, and circumstantial evidence, based on the size of the delivery territory and the need for prompt delivery—establishes that the delivery workers were required to use bicycles to perform of their job duties, and thus distinguishes this case from the one on which defendants rely.  *See* Def. Br. 31 (citing *Huo v. Go Sushi Go 9th Ave.*, No. 13 Civ. 6573 (KBF), 2014 WL 1413532, at *3–4 (S.D.N.Y. Apr. 10, 2014) (plaintiff's conclusory allegations that he needed bicycle to deliver hot meals insufficient where he did not supply more detail about frequency of use, distance required to be traveled, or problems presented by absence of a bicycle)).

Defendants are therefore liable to plaintiff delivery workers for their costs in obtaining and maintaining their bicycles, including the cost of the bicycles themselves and replacing tires and brakes.  *See Ke*, 595 F. Supp. 2d at 257–58; *Cao*, 2010 WL 4159391, at *4–5.  The Court also finds that defendants are liable for the costs related to the purchase and use of helmets, vests, and bicycle lights.  *See* N.Y. Vehicle and Traffic Law § 1236 (requiring that every bicycle be equipped with two lights and a brake); N.Y.C. Admin. Code § 10.157 (e) & (i) (requiring that businesses using bicycles for commercial purposes provide protective headgear to bicycle operators, and that bicycle operators wear protective headgear and a reflective vest).

However, Rodriguez is not entitled to recover for the cost of the whistle or raincoat.  A whistle is not only not a required piece of equipment, but is prohibited for use on a bicycle.  N.Y.

Vehicle and Traffic Law § 1236(b) (providing that a "bicycle shall not be equipped with nor shall any person use upon a bicycle a siren or whistle").  Similarly, the raincoat was not a required piece of equipment, and the Court holds that its use was primarily for Rodriguez's own benefit and not defendants'.  *See Ke*, 595 F. Supp. 2d at 257–58 (holding that employees were required to be compensated for bicycles and repair expenses based on their entitlement to credits for "'facilities' that are 'primarily for the benefit or convenience of the employer'" (citing 29 C.F.R. § 531.3(d)(1))).

## XVIII. Damages

### A.    Statutes of Limitations

The statute of limitations for FLSA actions is two years, or three years in cases of willful violations.  29 U.S.C. § 255.  "An employer willfully violates the FLSA when it 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by' the [FLSA]." *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).  "The burden is on the employee to show willfulness."  *Id.*

Plaintiffs here have not met their burden of showing willfulness.  As explained, plaintiffs adduced no evidence regarding defendants' state of mind, so as to establish that defendants knew their conduct was prohibited by the FLSA, or that they consciously disregarded the risk that it was.  An employer's actions, even if unreasonable, cannot be held willful absent a showing of recklessness.  *McLaughlin*, 486 U.S. at 135 n.13.  While the Court was distressed by defendants' submission of fabricated evidence and incredible testimony, the relevant question is whether defendants acted willfully at the time they violated the FLSA.  Here, there is insufficient evidence beyond the violations themselves to support such a finding.  Therefore, the FLSA's two-year statute of limitations applies.

The statute of limitations period continues to run with respect to each potential plaintiff's collective action claim until that plaintiff files the written consent form. *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 199 (S.D.N.Y. 2006) (citing 29 U.S.C. §§ 255, 256). Therefore, all of plaintiffs' FLSA claims that accrued before November 5, 2013, two years before plaintiffs filed their consents to join this collective action, are barred by the statute of limitations.

The statute of limitations for actions brought under the NYLL is six years. Joint Stip. of Law ¶ 4; N.Y. Lab. Law § 198(3). There is, therefore, no statute of limitations bar to any of plaintiffs' claims under New York law.

### B.     Back Wages, Costs of Tools of the Trade, and Statutory Damages

For the reasons stated earlier, the Court holds that plaintiffs are entitled to compensatory damages for defendants' failure to pay them their wages required under the FLSA's and NYLL's minimum wage and overtime provisions; unpaid spread-of-hours pay under the NYLL; and statutory damages for defendants' violations of the NYLL's wage notice and wage statement provisions.

Plaintiffs, however, may not receive a "double recovery" of back wages under both the FLSA and NYLL. *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 333 (1980); Pl. Br. 19 n.8. Plaintiffs' damages award under the NYLL necessarily will subsume their award under the FLSA, both because of the higher minimum wage that governed during certain periods and because of the longer period covered by the NYLL. While the Court will formulate a separate damages award for each claim, as a matter of economic reality, for each plaintiff, the NYLL award will be decisive.

As to the mechanics of calculating back wages, the Court's finding that plaintiffs were not paid an hourly rate requires, under both the FLSA and NYLL, that the Court calculate their regular rate of pay for the purposes of a damages calculation. Under the FLSA, "[t]he regular

rate is 'the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed,' and is calculated by 'dividing the employee's weekly compensation by the number of hours for which that compensation is intended.'" *Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 338 (S.D.N.Y. 2005) (quoting *Walling v. Youngerman–Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945) and *Moon*, 248 F. Supp. 2d at 230; citing also 29 C.F.R. § 778.109) (internal citations omitted).  Under the NYLL, the Court divides the pay the plaintiff in question actually received by the lesser of 40 hours or the actual number of hours he worked during the work week.  12 N.Y.C.R.R. § 146-3.5.

For all of the delivery workers, whether their regular rates of pay are calculated using 40 hours per week or the actual number of hours the Court has found they generally worked (or the rate of $6 per hour defendants claimed they paid the delivery workers), their regular rates of pay fall below the minimum wage.  Therefore, the delivery workers' regular rate of pay for the purposes of calculating the overtime pay they are due is the statutory minimum wage under both the FLSA and NYLL.  *See* 29 C.F.R. 778.107 ("The regular rate of pay at which the employee is employed may in no event be less than the statutory minimum."); *Copantitla*, 788 F. Supp. 2d at 291 (the regular rate of pay is the "regular rate at which [an employee] is lawfully employed," and thus is the higher of the FLSA's minimum wage or the minimum wage applicable by virtue of other legislation (quoting 29 C.F.R. § 778.5)); 12 N.Y.C.R.R. § 146–3.5(a) ("The term regular rate shall mean the amount that the employee is regularly paid for each hour of work, before subtracting a tip credit, if any."); *id.* § 146-1.4 (calculating the regular rate of pay using at least the minimum wage in the examples provided).[29]

---

[29] Under 12 N.Y.C.R.R. §§ 146-1.4 and 146-3.5, even the $9 overtime rate defendants purportedly paid to the delivery workers would have been insufficient, as the regulation requires a tipped employee's overtime rate of pay to be calculated based on a regular rate of pay *before*

As to Romero and Rosales, to calculate their regular rate of pay, their regular weekly salary should be divided by 40 hours. There is a rebuttable presumption that an employee's fixed weekly salary covers 40 hours worked. *Giles v. City of New York*, 41 F. Supp. 2d 308, 316–17 (S.D.N.Y. 1999). Defendants have not rebutted that presumption here with respect to either Romero or Rosales. *See supra* section IV.B. Because each was paid a fixed weekly salary, their regular rate of pay should be calculated by dividing those salaries by 40 hours. *Giles*, 41 F. Supp. 2d at 317; 12 N.Y.C.R.R. § 146-3.5.

Although Rosales was paid weekly wages different from his regular salary for three weeks in July 2014—receiving an extra one-sixth of his regular weekly pay, essentially an extra day's pay for working seven days for two of those weeks, and receiving $527 for one week for which no explanation was offered—the Court finds that these aberrations do not undermine the conclusion that he was paid a fixed weekly salary. For those weeks, Rosales's regular rate of pay should be calculated by dividing his regular rate of pay during that time period—$575—by 40 hours.[30] The Court also holds that the $400 "advance" that Rosales received on September

---

subtracting the tip credit. The same is true under the FLSA. *See* 29 C.F.R. § 531.60. Because the Court has found that defendants were not entitled to utilize the tip credit, the regular rate of pay used to calculate damages for the delivery workers must be the minimum wage under the NYLL.

[30] Plaintiffs conceded that, in certain weeks, they worked fewer hours than per their normal schedules—an inference that follows from plaintiffs' receipt on those weeks of wage amounts that were much lower than normal. Pl. Br. 9 n.3. The Court has reviewed plaintiffs' proposed damages calculations and the inferences drawn as to the hours worked those weeks. The Court finds plaintiffs' approximations of the hours worked in those aberrant weeks reasonable, and accepts them for use in the damages calculations to follow this Opinion, with these exceptions: (1) Rodriguez: for 9/1-9/13/13, Rodriguez should be credited as having worked 35 hours each week and having received $125 per week, per the Pay Journal; (2) Marco: for 7/15–7/21/13, Marco should be credited with having worked 45 hours; (3) Rosales: for 7/7–7/20/13, Rosales should be credited with having worked 80 hours per week; and (4) Gonzalez: Gonzalez's hours should be calculated based on the number of days he worked each week, as explained *supra* note 14; for the purposes of calculating his hours per week, in weeks in which Gonzalez worked five

30, 2014 should be credited against the back wages defendants owe Rosales as partial payment for his work between September 22 and 30, 2014.

With regard to Marco, Rodriguez, Gonzalez, and Rosales, whose testimony established the month, but not the specific date, they began working for Spice Symphony, the Court awards damages beginning on the 15th day of the month they began their employment.

With regard to the delivery workers' tools of the trade, the Court awards damages to plaintiffs for the costs of purchasing and repairing their delivery bicycles, and purchasing related required equipment, including a helmet, reflective vest, and bicycle lights. However, because plaintiffs have not provided documentation to support their declarations as to the amount they spent, or explanations for why they purchased more than one of certain items, so as to enable the Court to evaluate the reasonableness of the amounts they attest that they spent, *see Cao*, 2010 WL 4159391, at *5, the Court awards damages that are, in some cases, less than the those plaintiffs seek. The Court hereby awards damages as follows:

- Gonzalez: $300 (bicycle); $45 (helmet); $50 (two vests); $30 (two lights); $30 (two wheel replacements); $30 (two brakes);

- Hernandez: $300 (bicycle); $35 (helmet);

- Rodriguez: $250 (bicycle); $35 (helmet); $30 (two vests); $70 (two brakes); $60 (two lights);

- Marco: $20 (vest); $40 (helmet); $30 (bicycle lights).[31]

With regard to defendants' failure to provide statutorily required wage notices and statements, the Court hereby awards each plaintiff $50 for each week he did not receive a wage

---

or more days, he should be credited with having worked both Friday and Saturday, and in weeks in which he worked four or fewer days, he should be credited with having worked only one of Friday or Saturday.

[31] Marco did not attest to the cost of his bicycle, and did not seek damages for the use of his bicycle in the proposed damages calculation.

notice, up to a maximum of $2,500, and $100 for each week he did not receive a wage statement, up to a maximum of $2,500.

As described below, the Court will invite the parties to submit revised damages calculations in accordance with the Court's findings as set forth in this Opinion.

### C.    Liquidated Damages

Both the FLSA and NYLL provide for liability for liquidated damages for an employee's unpaid wages.  Defendants are liable for liquidated damages under the standards of both statutes. However, the Court declines to award cumulative liquidated damages awards.  The Court instead makes the liquidated damages awards under the FLSA and the NYLL overlapping, meaning, in practice, that the larger liquidated damages award (under the NYLL) supplies the measure of plaintiffs' recovery.  The Court's reasoning for awarding liquidated damages, while declining to permit cumulative recovery, follows.

As to the FLSA, an employer who violates the statute's compensation provisions "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).  These statutory damages are not a sum certain, but rather are derivative of compensatory damages.  While liquidated damages "are the norm," *Reich*, 121 F.3d at 71, an employer may avoid them if it establishes "by 'plain and substantial' evidence, its subjective good faith and objective reasonableness,'" *Moon*, 248 F. Supp. 2d at 234. Courts may exercise discretion to deny liquidated damages where the employer shows that even in violating statutory and regulatory wage, hour, and recordkeeping requirements, it acted in subjective "good faith" and had objectively "reasonable grounds" for believing that the unlawful acts did not violate the FLSA.  29 U.S.C. § 260.  "To establish the requisite subjective 'good faith,' an employer must show that it took active steps to ascertain the dictates of the FLSA and

67

then act to comply with them." *Hart*, 967 F. Supp. 2d at 938 (quoting *Barfield*, 537 F.3d at 150) (internal quotation marks omitted).  The employer's burden to prove good faith is "a difficult one." *Barfield*, 537 F. 3d at 150 (quoting *RSR*, 172 F.3d at 142) (internal quotation marks omitted).

Similarly, under the NYLL, an employee is entitled to "liquidated damages equal to one hundred percent of the total amount of wages found to be due," "unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law." N.Y. Labor Law §§ 198(1–a) (effective April 9, 2011).  "[C]ourts have not substantively distinguished the federal standard from the current state standard of good faith." *Inclan*, 95 F. Supp. 3d at 505.

Here, the Court holds that defendants have failed to satisfy their difficult burden of showing good faith.  They have failed to show, let alone by plain and substantial evidence—actually, by any evidence—that they acted with subjective good faith.  Absent evidence that defendants took some concrete step to assure compliance with these laws, the Court does not credit defendants' conclusory assertions that they "acted in good faith to comply with the FLSA and the NYLL."  Chaouhan Aff. ¶ 22; Leo Decl. ¶ 21; Rodrigues Aff. ¶ 22.  Therefore, defendants are liable for liquidated damages under both the FLSA and NYLL.

As to the relationship between plaintiffs' federal and state liquidated damage awards, "[t]here is no appellate authority as to whether a plaintiff may recover cumulative (sometimes called 'simultaneous' or 'stacked') liquidated damages under the FLSA and NYLL, and the district courts in this Circuit are deeply divided." *Inclan*, 95 F. Supp. 3d at 505 (collecting cases).  Plaintiffs urge that cumulative liquidated damages are proper, on the ground that the liquidated damages provisions of the two statutory schemes serve different functions, with such

damages being viewed as compensatory under the FLSA and punitive under the NYLL.  Pl. Br. 26–27.[32]  Numerous courts have indeed so held.  *See, e.g.*, *Lanzetta v. Florio's Enters., Inc.*, No. 08 Civ. 6181 (DC), 2011 WL 3209521, at \*5 (S.D.N.Y. July 27, 2011) (liquidated damages under both statutes permissible because FLSA liquidated damages "are considered compensatory rather than punitive in nature," whereas NYLL liquidated damages are punitive because they "constitute a penalty to deter an employer's willful withholding of wages due" (quoting *Reich*, 121 F.3d at 71, and *Reilly v. NatWest Mkts. Grp. Inc.*, 181 F.3d 253, 265 (2d Cir. 1999) (internal quotation marks omitted)).

However, these decisions predate recent amendments to the NYLL's liquidated damages provision, which, in the Court's view, undermine the conclusion that that provision is punitive. Before the amendments, the NYLL had provided for liquidated damages only for an employer's "willful" violations.  *See Reilly*, 181 F.3d at 264.  It was on the basis of the requirement of willfulness that the Appellate Division, First Department—on which the Second Circuit in *Reilly* relied—held the NYLL liquidated damages provision to impose a penalty.  *See Carter v. Frito-Lay, Inc.*, 425 N.Y.S.2d 115, 116 (1st Dep't 1980) ("Plaintiff contends that the provision for liquidated damages is not a penalty but additional compensation. We do not find this contention convincing in light of the application of this provision *being expressly conditioned on a finding of willful conduct* on the part of the employer." (emphasis added)), *aff'd*, 52 N.Y.2d 994 (1981). As amended, however, the NYLL liquidated damages provision no longer requires a showing of willfulness.  Effective November 24, 2009, the NYLL has removed the requirement of willfulness, so as now to provide, like the FLSA, that an employee is entitled to liquidated

---

[32] Defendants' brief did not address whether plaintiffs' could collect liquidated damages under both statutes.

damages except where the employer demonstrates its good faith.  2009 N.Y. Sess. Law Ch. 372 (A. 6963) (McKinney's).  In addition, effective April 9, 2011, the NYLL provision was modified to track the FLSA's as to the amount of liquidated damages, which may now reach 100% of the wages owed, as opposed to 25% pre-amendment.  2010 N.Y. Sess. Law Ch. 564 (S. 8380) (McKinney's).

Several courts in this District, identifying cumulative liquidated damages as the majority approach, have continued to stack liquidated damages awards under both statutes even after the recent amendments to the NYLL.  *See, e.g.*, *Tackie v. Keff Enters. LLC*, No. 14 Civ. 2074 (JPO), 2014 WL 4626229, at *5 (S.D.N.Y. Sept. 16, 2014); *Ho v. Sim Enters., Inc.*, No. 11 Civ. 2855 (PKC), 2014 WL 1998237, *18–19 (S.D.N.Y. May 14, 2014).  But, in light of the convergence that the amendments effect between the NYLL's and the FLSA's liquidated damages provisions, the Court joins those courts to find the earlier distinction between the FLSA's compensatory provision and the NYLL's punitive provision to now be elusive, and to hold that a cumulative award of liquidated damages would amount to an impermissible double recovery.  *See, e.g.*, *Inclan*, 95 F. Supp. 3d at 505–06; *Parilla v. Salt & Pepper on 33rd St. Inc.*, No. 12 Civ. 6382 (AKH), 2013 WL 4536628, at *2 (S.D.N.Y. Apr. 8, 2013); *Gortat v. Capala Bros.*, 949 F. Supp. 2d 374, 381 (E.D.N.Y. 2013) ("[T]he distinction . . . [is] semantic, exalting form over substance."); *see also Greathouse v. JHS Sec., Inc.*, No. 11 Civ. 7845 (PAE) (GWG), 2012 WL 3871523, at *7 (S.D.N.Y. Sept. 7, 2012), *report and recommendation adopted as modified*, 2012 WL 5185591 (S.D.N.Y. Oct. 19, 2012), *vacated on other grounds*, 784 F.3d 105 (2d Cir. 2015); *see generally* Alexander J. Callen, Note, *Avoiding Double Recovery: Assessing Liquidated Damages in Private Wage and Hour Actions Under the Fair Labor Standards Act and the New York Labor Law*, 81 Fordham L. Rev. 1881 (2013) (arguing, based on text, structure, and

legislative history of NYLL liquidated damages provision as amended, that the recent amendments were intended to conform the NYLL to the FLSA, that the provision has a mixed compensatory and punitive purpose, and that courts should award only one set of liquidated damages to avoid overlapping damages).

The Court accordingly awards plaintiffs liquidated damages under both provisions, equal to 100% of the minimum wages, overtime wages, and (as to the NYLL) the spread-of-hours pay owed under these respective statutes. These awards, however, are overlapping, not cumulative, such that the larger, NYLL award sets each plaintiffs' liquidated damages recovery.

### D.   Prejudgment Interest

Plaintiffs are entitled to prejudgment interest on their NYLL spread-of-hours claims, the only claims on which they seek prejudgment interest.

Prejudgment interest, under both federal and New York law, compensates a plaintiff for the defendant's interest-free use of the money owed to the plaintiff. *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 714–15 (1945) (FLSA); *Reilly*, 181 F.3d at 265 (NYLL). Under the FLSA, as reviewed above, liquidated damages have also been held compensatory, and therefore, "[i]t is well settled that in an action for violations of the [FLSA] prejudgment interest may not be awarded in addition to liquidated damages." *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1064 (2d Cir. 1988) (per curiam); *see also Brooklyn Sav. Bank*, 324 U.S. at 714–15, ("To allow an employee to recover the basic statutory wage and liquidated damages, with interest, would have the effect of giving an employee double compensation for damages arising from delay in the payment of basic minimum wages").

As to the NYLL, "[c]ourts typically award prejudgment interest on damages for NYLL violations." *McLean v. Garage Mgmt. Corp.*, No. 09 Civ. 9325 (DLC), 2012 WL 1358739, at *10 (S.D.N.Y. Apr. 19, 2012). Historically, the case law permitting the award of prejudgment

interest alongside an award of liquidated damages for NYLL violations relied on the distinction between the punitive purpose of NYLL liquidated damages and the compensatory purpose of prejudgment interest. *See Reilly*, 181 F.3d at 265. The Court has held that liquidated damages under the NYLL no longer are clearly punitive. However, a separate basis applies for the award of prejudgment interest alongside a liquidated damages award. As recently amended, the NYLL expressly provides for a plaintiff to receive both types of awards. *See* N.Y. Labor Law § 198(1-a) ("[T]he court shall allow [an] employee to recover . . . prejudgment interest as required under the civil practice law and rules, and, unless [the employer proves good faith], an additional amount as liquidated damages . . . ."); 2010 N.Y. Sess. Law Ch. 564 (S. 8380) (McKinney's).

The Court therefore finds that plaintiffs are entitled to prejudgment interest on their NYLL claims to the extent they have pursued it—*i.e.*, on their spread-of-hours claims.[33] Prejudgment interest is to be calculated pursuant to the New York prejudgment interest rate of nine percent (9%) per annum simple interest from a single reasonable intermediate date. N.Y. C.P.L.R. §§ 5001(b), 5004; *McLean*, 2012 WL 1358739, at *11. Therefore, prejudgment interest shall be calculated from the median date between each plaintiff's start date and end date of employment at Spice Symphony.

### E.    Attorneys' Fees and Costs

Both the FLSA and NYLL provide for prevailing plaintiffs to be awarded attorneys' fees and costs for actions to recover unpaid wages. 29 U.S.C. § 216(b) ("The court . . . shall . . . allow a reasonable attorney's fee to be paid by the defendants, and costs of the action."); N.Y.

---

[33] Plaintiffs have not sought prejudgment interest for their NYLL minimum wage and overtime claims. The Court has no occasion here to consider whether an award of prejudgment interest would have been available on those claims.

Lab. Law § 663(1) (prevailing employee shall recover underpayments "together with costs all reasonable attorney's fees").

The Court therefore holds that plaintiffs are entitled to recover costs and reasonable attorneys' fees, upon a proper showing of such costs and fees.

### F.    Judgment Unpaid Within 90 Days

The Court holds that "if any amounts [of damages awarded under the NYLL] remain unpaid upon the expiration of ninety days following issuance of judgment, or ninety days after expiration of the time to appeal and no appeal is then pending, whichever is later, the total amount of judgment shall automatically increase by fifteen percent." N.Y. Lab. Law § 198(4).

## CONCLUSION

In consideration of the foregoing findings of fact and conclusions of law, the Court finds that plaintiffs have proven, by a preponderance of the evidence, that defendants JRPAC Inc., (d/b/a Spice Symphony), Jude Rodrigues, Chad Leo, and Premendra Chaouhan violated the Fair Labor Standards Act and New York Labor Law by failing to pay minimum and overtime wages, as well as by failing to pay spread-of-hours pay and to provide wage notices and statements as required under the New York Labor Law. For these violations, the Court awards plaintiffs compensatory and liquidated damages, statutory damages, and prejudgment interest on the spread-of-hours damages.

The Court's conclusions of fact, conclusions of law, and conclusions as to aspects of damages differ from those proposed by the parties. And the damages calculations necessitated by this decision require multiple calculations, with respect to each plaintiff and cause of action. These calculations are best performed, in the first instance, by counsel. Accordingly, the Court

73

hereby directs the parties to submit revised proposed damages calculations consistent with this Opinion.[34] The Court hereby sets the following schedule for such submissions:

By June 17, 2016, plaintiffs shall provide a letter to defendants (but not then filed on ECF) itemizing, by plaintiff and by claim, plaintiffs' proposed damages calculation and explaining, clearly and with specificity, the basis for each calculation.

By June 24, 2016, defendants shall provide a letter to plaintiffs stating whether they have any objections to any of plaintiffs' proposed damages calculations, and if so, explaining, clearly and with specificity, the basis for each point of disagreement, and stating (and explaining the basis for) defendants' contrary calculation. In the event defendants disagree as to any aspect of plaintiffs' damages calculation, the parties are directed to meet and confer to attempt to resolve any discrepancies.

By June 30, 2016, either (1) the parties shall jointly submit a proposed damages calculation, or (2) plaintiffs shall file its proposed damages calculation, in which case defendants shall file any opposition by July 6, 2016, and plaintiffs shall file a reply by July 12, 2016.


SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge


Dated: June 9, 2016
      New York, New York

---

[34] For avoidance of doubt, counsel's damages calculations will not be taken as concessions as to liability or damages by either side. They are merely the parties' calculations derived from the findings herein.

74